The Van Iderstine Company v. Commissioner.
Van Iderstine Co. v. Commissioner
Docket No. 59074.
United States Tax Court
T.C. Memo 1957-177; 1957 Tax Ct. Memo LEXIS 72; 16 T.C.M. (CCH) 790; T.C.M. (RIA) 57177; September 23, 1957
*72 Ivar N. Nelson, Esq., 1659 First National Bank Building, Chicago, Ill., for the petitioner. Emil Sebetic, Esq., and Herbert Rothenberg, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax for the year 1950 in the amount of $23,724.58. The only question argued by petitioner on brief is whether certain payments made by petitioner constitute ordinary and necessary business expenses deductible under section 23(a)(1)(A), Internal Revenue Code of 1939. Other agreed on or conceded adjustments can be made in a Rule 50 computation. Findings of Fact Some of the facts are stipulated, are so found, and the stipulation is included herein by reference. Petitioner is a corporation organized and existing under the laws of the State of Maine, with its principal office in Long Island City, New York. Petitioner maintains its books and records and files its income tax returns on an accrual and calendar year basis. The return for the taxable year 1950 involved herein was filed with the collector of internal revenue for the first district of New York. Petitioner is engaged in the *73 business of general rendering of inedible fats and oils. In the operation of its business petitioner collects its raw materials; namely, inedible animal fats, offal and bones from butcher shops, chain stores, restaurants, hotels and slaughter houses. These raw materials, in turn, are rendered by petitioner in its plant for tallow, grease and glue content. The tallow and grease thus extracted are sold principally to soap manufacturers. The glue extracted is sold principally to gum tape manufacturers, and to other manufacturers and distributors for blending. After the tallow, grease and glue have been extracted, the remaining solids, generally referred to as cracklings, bone meal and meat scraps, are sold principally for animal feeds. The collecting and securing of raw materials in a large and steady volume is an essential part of petitioner's business. Petitioner employs a number of drivers to collect and haul the materials to its plants. Petitioner also employs a number of solicitors to call on the suppliers of materials; to contact and discover new sources of materials, to adjust and settle difficulties and disagreements with the suppliers; and to perform in general such services *74 as may be necessary to keep a steady flow of materials into petitioner's plants. To insure a large and steady volume of raw materials into its plant, among other things, petitioner at times made various individual lump sum payments to suppliers as set forth below: Year
Payments
1950
Month
Supplier
Debit
Credit
Jan.
T. D. Meat Company
$ 150.00
$ 150.00
E. Lipton
100.00
A. Mavromatis
100.00
M. & M. Food Mar-
ket
300.00
City Wide Stores
1,000.00
1,000.00
City Wide Stores
2,000.00
Rudolph Schwartz
350.00
G. & B. Food Center
200.00
Feb.
Oxford Market
125.00
Nola Food Market
100.00
Rudolph Schwartz
350.00
350.00
R. Alvino
200.00
Hertlein & Weid
250.00
S. Alexander
300.00
Triboro Meat & Food
350.00
Mar.
Cedar Market
200.00
J. Finaldi
100.00
W. Schildt
75.00
V. Indovino
50.00
H. Boaz
50.00
F. Sheehan
83.28
Apr.
Jos. Cittarella
110.00
A. Lombardi
200.00
Scoca Rt. 17
14.00
Lipton Super Mar-
ket
73.84
May
Model Market
125.00
Thomas Kelly
300.00
City Wide Stores
2,000.00
Regent Food Shop
200.00
J. Luscher
200.00
June
Perusa & Longebardi
200.00
200.00
Hafts Market
300.00
Model Market
125.00
July
R. Mirth
300.00
A. Marino
25.00
Aug.
Food Fair Stores
5,000.00
Sept.
Food Fair Stores
5,000.00
S. Rosengarten
500.00
Oct.
Food Fair Stores
5,000.00
A. Wertz
50.00
City Meat Market
175.00
Geo. & O. Kraus
175.00
Nola Food Market
66.64
Nov.
Paramount Market,
Inc.
500.00
Food Fair Stores
5,000.00
Peter Reeves Market
100.00
Union City Kosher
But. Ass'n
1,000.00
City Meat Market
167.54
Dec.
T. Mossesso
50.00
Food Fair Stores
5,000.00
Pure Food Meat
Market
300.00
Miscellaneous
105.34
Total
$37,890.34
$2,605.30
*75 The payments made to Food Fair Stores, as set forth above, were made at the rate of $2,500 per store, in consideration for agreements giving petitioner the right for an indeterminate period to purchase all such raw materials as Food Fair Stores might have, at their stores, at such prices as would from time to time be agreed upon by petitioner and Food Fair Stores. There was no understanding or agreement between petitioner and Food Fair Stores as to the period of time during which petitioner would be permitted to purchase and collect raw materials from Food Fair Stores and such agreements were subject to being discontinued at any time by either party. Similar agreements had been made with Food Fair at varying amounts per store since 1939 with reference to upwards of 50 of its stores. These agreements were still in effect at the time of the trial of this case. During 1950 petitioner entered into contracts with various other suppliers numbering about 30, whereby the suppliers agreed to sell and petitioner agreed to buy all shop fat, suet, etc. produced at the suppliers' stores. Most of these agreements were for one or two-year periods and were for the most part in written form. Two *76 were of indefinite duration. A typical agreement was as follows: "For One Dollar ($1.00), receipt of which is hereby acknowledged and other valuable considerations, we agree to buy and you to sell us for a period of Two (2) years from date of opening, all shop fat, suet, bones and skins produced at your store at * * * at New York City market prices as published in the Butchers' Advocate. "It is understood that should you sell or close this store within Two (2) years from date of opening, you are to refund us $8.33 for each month remaining from the date of closing or selling to the date of expiration of this contract, such entire balance being immediately due." The refund provisions of the contracts as set forth above were based on a monthly allocation of the lump sum payment made under the contract and such amount refundable was in no way related to or dependent upon the amount of materials purchased by petitioner under the contracts. The payments to be made pursuant to these contracts were arrived at by direct negotiations with the individual supplier by one of petitioner's representatives. Various pricing arrangements were agreed upon based upon the bargaining strength of *77 the individual supplier. Some of the contracts called for "New York City Market Price," others called for "Butcher Advocate" prices. One contract called for "our regular contract market price," and still another referred to "prices usually paid by us to other markets of similar size and producing similar quantities and qualities of the above-mentioned materials, less the sum of one-half cent per pound of shop fat and suet." Petitioner did not achieve price reductions by virtue of such contracts, although in some instances through bargaining, the price arrangement with one supplier may have been more favorable to petitioner than with other suppliers, and in some instances the price paid one supplier may have been different under the contract from the price arrangement that was in effect prior to the contract. Payments made pursuant to such contracts to suppliers ranged from $2,000 down to $50 and totalled something more than $9,000. Petitioner also made a payment of $1,000 in 1950 to Union City Kosher Butchers Association. The petitioner's corporation income tax return for 1950 includes the following items: Gross sales
$13,325,103.09
Cost of goods sold
9,598,026.47
Gross profit from sales
3,727,076.62
Total income
3,746,761.41
Compensation of officers
140,320.84
Salaries and wages
2,307,973.23
Net income
741,951.10
*78 Opinion The petitioner was in the business of rendering. It processed meat scrap and bones. These were obtained from slaughter houses, butcher shops, hotels and restaurants. Since the materials were perishable and had to be processed immediately, the plant operated 24 hours a day. For economical operation a steady flow of raw materials was necessary and solicitors were employed to locate new sources of material. To secure a continuous supply of material the petitioner found it advantageous to effect agreement with individual sources of supply paying a sum of money at the time of the agreement and paying later for the materials collected from that source at prices arrived at as specified in the agreements. In the taxable year 1950 the petitioner paid $25,000 pursuant to such contracts to Food Fair Stores at the rate of $2,500 for each of 10 new stores opened by this concern during that year. These contracts were oral and gave petitioner the right to purchase and collect all such raw materials as the stores might have at such prices as might be agreed upon from time to time. There was no understanding as to the duration of these agreements. The respondent argues that the agreements *79 were for an indefinite time, that petitioner is still enjoying these rights, that the payments were for the purchase of intangible capital assets, these being the rights to purchase all the materials from these stores, and that the payments may not be treated as business expenses, nor can they be recovered through an allowance for depreciation. We agree with the respondent. The payments made to Food Fair were for the purpose of assuring petitioner a source of supply for materials it needed in its business. The agreements calling for the payments gave petitioner the right to purchase such materials as the Food Fair stores might have, and as we see it, the payments were made for this right, referred to in testimony as the right to "load" stores belonging to Food Fair. The rights under these contracts were still extant in 1957 when this case was tried and it is evident that they had an economic value extending well beyond the year 1950, the tax year in question. The right thus acquired is an intangible capital asset and the amounts paid therefor are in the nature of capital expenditures rather than ordinary and necessary business expenses. See Hickok Oil Corporation v. Commissioner, 120 Fed. (2d) 133 *80 (C.A. 6); Chase Candy Company v. United States, 126 Fed. Supp. 521 (Ct. Claims); Nachman v. Commissioner, 191 Fed. (2d) 934 (C.A. 5), affirming 12 T.C. 1204; Pittston Co., 26 T.C. 967. The respondent argues further that since the rights to purchase materials from Food Fair are of indefinite duration their cost cannot be depreciated, citing V. P. Shufflebarger, 24 T.C. 980; Chase Candy Company v. United States, supra, and Nachman v. Commissioner, supra, among other cases. We need not decide this question. The petitioner makes no claim for depreciation. Its argument here is that no intangible asset was acquired, that the payments were for the promotion and encouragement of its business and to settle disputes with its suppliers and hence were ordinary and necessary business expenditures. We have concluded, however, that the evidence does not support petitioner's contention and our findings of fact lead to the conclusion argued for by the respondent, i.e. than an intangible capital asset was acquired. The petitioner thus raises no issue with respect to depreciation and we do not decide any. Neither *81 do we decide whether upon cancellation or termination of the agreements in some future year petitioner might be able to claim a deduction for the amounts in question. That issue is not here. Cf. Tulane Hardwood Lumber Co., 24 T.C. 1146. With respect to the payments made to suppliers other than Food Fair, the facts are essentially similar to the Food Fair payments and we hold that they also resulted in the acquisition of intangible capital assets. The only difference is that all but two of the contracts with other suppliers were for definite terms. The respondent concedes that it is proper for him to allow the payments on contracts for a definite period extending beyond the taxable year to be depreciated pro rata over the contract term. This can be taken into account in a Rule 50 computation. The payments made on contracts with other suppliers which were of indefinite duration must be accorded the same treatment as the payments to Food Fair. They may neither be depreciated nor treated as business expenses in 1950. Turning to the remaining issue, the petitioner paid $1,000 in November 1950 to the Union City Kosher Butcher Association. No evidence was presented to show *82 what benefits the petitioner may have expected to derive from this payment. A witness for petitioner testified that this payment was "in the nature of advertising," that it was made to help defray the expenses of the association in promoting the interest of its members as to the prices they obtain for fat and bones and the prices they pay for meat and hence was in the interest of the petitioner. There is no evidence in the record to show that any publicity for petitioner resulted from the making of the payment or that any good will was engendered thereby. The record fails to show the payment was a business expense of the petitioner. The respondent correctly disallowed this item. Decision will be entered under Rule 50.