The BIRMINGHAM NEWS COMPANY, Plaintiff,

v.

George D. PATTERSON, Jr., District Director of Internal Revenue, Defendant.

Civ. A. No. 10191.

United States District Court
N. D. Alabama, S. D.

Dec. 16, 1963.

---

2. Notice of loss was given the insurance carrier May 1, 1959—more than nine months after the date of discovery of loss.

Lee C. Bradley, Jr., Douglas Arant and Robert H. Walston, of Bradley, Arant, Rose & White, Birmingham, Ala., and, Goldman, Evans & Goldman, New York City, of counsel, for plaintiff.

Macon L. Weaver, U. S. Atty., and E. Ray Acton, Asst. U. S. Atty., Birmingham, Ala., and, Louis F. Oberdorfer, Asst. Atty. Gen., and Edward S. Smith, Myron C. Baum and John F. Murray, Attys., Dept. of Justice, Washington, D. C., for defendant.

LYNNE, Chief Judge.

This cause, coming on to be heard, was submitted for the judgment of the court, without the intervention of a jury, upon the pleadings, the order on pretrial hearing and the proof consisting of the stipulation of facts and the oral testimony of witnesses. Upon consideration thereof, aided by able briefs of counsel, the court proceeds to enter the following opinion and abbreviated findings of fact and conclusions of law.

## OPINION

Suing to recover federal income taxes alleged to have been illegally assessed and collected for the years 1956, 1957, and 1958, after complying with all jurisdictional requirements, plaintiff contends that the Commissioner erred in disallowing annual amortization or depreciation deductions of its cost basis of the Agency Contract, dated May 9, 1950, between its predecessor and Birmingham Post Company (the Post) on the asserted ground that such contract has no ascertainable life for amortization or depreciation purposes.

Finding as facts those which have been stipulated by the parties,[1] the court

1. The attached pages numbered from 1 to 20, inclusive, and labeled "Exhibit A," constitute a true and correct copy of the contract entered into between The Birmingham News Company ("the Old News") and Birmingham Post Company on May 9, 1950, together with all appendices thereto, and the letter agreement executed by each of the said parties on even date therewith. (Exhibit not reproduced.)

2. The attached page labeled "Exhibit B" constitutes a true and correct copy of the amendatory agreement executed on May 17, 1950 (the said contract, the said appendices thereto, and the said letter agreement referred to in paragraph 1 hereof and the same amendatory agreement referred to in this paragraph 2 hereof being hereinafter together referred to as the "agency contract"). (Exhibit not reproduced.)

3. The attached page labeled "Exhibit C" constitutes a true and correct copy of all those portions of the minutes of a meeting of the Board of Directors of the Old News held on May 8, 1950, pertaining to the authorization and execution of the agency contract. (Exhibit not reproduced.)

4. The attached pages numbered 1 and 2, and labeled "Exhibit D," contain a true and correct copy of a resolution duly adopted by the Board of Directors of Remoc Publishing Company on April 9, 1956, approving a plan for voluntary liquidation and dissolution of the Old News. (Exhibit not reproduced.)

5. The attached pages numbered 1 and 2, and labeled "Exhibit E," constitute a true and correct copy of a resolution duly adopted by the Board of Directors of the Old News on April 30, 1956, approving a plan for the voluntary liquida-

will have occasion to advert to inferences of some significance distilled from the oral testimony. The statutory provisions involved are Sections 167(a) and 167(f)

tion and dissolution of the Old News. (Exhibit not reproduced.)

6. The attached pages numbered from 1 to 6, inclusive, and labeled "Exhibit F," constitute a true and correct copy of the Bill of Sale of all assets of the Old News to Remoc Publishing Company. (Exhibit not reproduced.)

7. The attached pages numbered from 1 to 3, inclusive, and labeled "Exhibit G," constitute a true and correct copy of the consent of Birmingham Post Company to the assignment of the agency contract and a copy of that assignment. (Exhibit not reproduced.)

8. The attached pages numbered from 1 to 3, inclusive, and labeled "Exhibit H," constitute a true and correct copy of the instrument conveying the good will of the Old News to Remoc Publishing Company. (Exhibit not reproduced.)

9. The attached pages numbered from 1 to 6, inclusive, and labeled "Exhibit I," constitute a true and correct copy of the certificate of incorporation of Remoc Publishing Company changing the name of that company to "The Birmingham News Company" (the "News"). The News is the Plaintiff. (Exhibit not reproduced.)

10. The attached pages numbered from 1 to 4, inclusive, and labeled "Exhibit J," constitute a true and correct copy of the agreement of dissolution of the Old News. (Exhibit not reproduced.)

11. On March 2, 1956, Remoc Publishing Company purchased all of the issued and outstanding capital stock of the Old News.

12. On May 31, 1956, all of the assets of the Old News were transferred to Remoc Publishing Company, pursuant to the plan of liquidation referred to in paragraphs 4 and 5 hereof.

13. If it be determined that the agency contract has an ascertainable life for amortization or depreciation purposes, the parties agree that the amortizable or depreciable basis for the agency contract is $3,009,000.

14. Except as stated in paragraph 15 hereof, the taxable income of the News without giving effect to a deduction for depreciation or amortization in respect of the agency contract for each of the taxable years ended December 31, 1956, December 31, 1957 and December 31, 1958 is as follows:

| Taxable Year | Taxable Income |
|---|---|
| 1956 | $ 536,627.96 |
| 1957 | 1,381,029.86 |
| 1958 | 1,587,497.31 |

15. The only questions at issue in this action are whether under the provisions of the United States Internal Revenue Code of 1954 the News is entitled to a depreciation or amortization deduction in respect of the agency contract according to the straight-line method, and, if so, the amount thereof for each of the said taxable years. If it be adjudged in this action that the News is entitled to a depreciation or amortization deduction in respect of the agency contract, the amount of taxable income for each of the said taxable years shown in paragraph 14 hereof shall be decreased by the amount of any such depreciation or amortization deduction and the News shall be entitled to a refund for each of the said taxable years based on the amount of decrease in taxable income.

16. On the date of execution of the agency contract on to-wit May 9, 1950, there was no stockholder relationship or other type of affiliation, direct or indirect, material to the issues in this cause between the Old News and the Birmingham Post Company, nor has any stockholder relationship or other type of affiliation, direct or indirect, which is material to the issues in this cause been established at any time since that date between said Birmingham Post Company and the News or the Old News. The only contractual, or other financial, relationships between the News and the Birmingham Post Company which are material to the decision of the issues involved in this cause are those which are established by the agency contract.

17. The foregoing paragraph 16 shall be deemed to have been included in the original Stipulation of Facts and be governed by all of the provisions thereof, and such original Stipulation of facts as modified hereby is hereby, in all respects, approved and continued in force.

18. At the date of execution of the Agency Contract, the Birmingham Post Company (the "Post") was publishing with its own facilities an evening newspaper known as "The Birmingham Post" for the six weekdays, and the Old News was publishing with its own facilities an evening newspaper known as "The Birmingham News" for the six weekdays, a morning newspaper known as "The Birmingham Age-Herald" for the six weekdays, and a Sunday newspaper distributed in the morning which was known as "The Birmingham News and Birmingham Age-Herald", with the words "The Birmingham News" printed at the top

of the Internal Revenue Code of 1954.[2] Guidelines for depreciation or amortization of intangibles may be found in Treasury Regulations.[3]

On and prior to May 9, 1950, there was in existence The Birmingham News Company (the Old News), an Alabama Corporation, the predecessor of plaintiff. It was engaged in publishing with its own facilities in Birmingham, Alabama, an evening newspaper known as The Birmingham News for the six weekdays, a morning newspaper known as The Birmingham Age-Herald for the six weekdays, and a Sunday newspaper distributed in the morning, known as The Birmingham News and Birmingham Age-Herald.

On and prior to May 9, 1950, the Post was engaged in publishing with its own facilities in Birmingham, Alabama, an evening newspaper known as The Birmingham Post for the six weekdays.

On May 9, 1950, the Old News entered into an agreement (the Agency Contract) with the Post under which the Old News, effective May 14, 1950, took over the printing, selling, and distribution of the newspaper published by the Post. Such contract provided, among other things, that the Old News would solicit all advertising for and print the Post's newspaper on the presses of the Old News and would maintain appropriate records; that the Old News would maintain its own editorial staff and determine its own

---

in large print and the words "Birmingham Age-Herald" printed below in small print.

19. The sum of $3,009,000 referred to in paragraph 13 of the Stipulation of Facts does not include any basis for good will or any constituent element of good will. In the determination of said amount of $3,009,000 account was taken only of the portion of the initial period of the Agency Contract from June 1, 1956 to May 14, 1980, both inclusive.

20. The foregoing paragraphs 18 and 19 shall be deemed to have been included in the original Stipulation of Facts and be governed by all of the provisions thereof, and such original Stipulation of Facts as modified hereby and by the Amendment to Stipulation of Facts is hereby, in all respects, approved and continued in force.

21. The net income earned by The Old News, solely as a result of the agency contract (after giving effect for income taxes) for each of the years 1951 through 1955, inclusive, was as follows:

| Year | Amount |
| --- | --- |
| 1951 | $312,560.47 |
| 1952 | 300,026.39 |
| 1953 | 298,207.89 |
| 1954 | 333,260.92 |
| 1955 | 375,305.32 |

22. The foregoing paragraph (21) shall be deemed to have been included in the original Stipulation of Facts and be governed by all of the provisions thereof, and such original Stipulation of Facts as modified hereby and by the Amendments to Stipulation of Facts is hereby, in all respects, approved and continued in force.

2. Internal Revenue Code of 1954. Section 167. DEPRECIATION

(a) General Rule.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

* * * *

(f) Basis For Depreciation.—The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain on the sale or other disposition of such property. (26 U.S.C.A. § 167)

3. 1.167(a)-3. Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. For rules with respect to organizational expenditures, see section 248 and the regulations thereunder. For rules with respect to trademark and trade name expenditures, see section 177 and the regulations thereunder.

editorial policies; that the Post would maintain its own editorial staff and determine its own editorial policies; that the Old News would publish an evening newspaper known as The Birmingham News and a Sunday newspaper known as The Birmingham News; that the Post would publish a morning newspaper known as The Birmingham Post-Herald; and that the Old News and the Post would not engage in the publication of any other newspaper in Jefferson County, Alabama, during the period of the contract.

Of critical importance is the following provision of such contract with respect to its duration:

"The period of this agreement shall begin at noon on the 14th day of May, 1950 (hereinafter called 'the effective date'), and shall continue for an initial period of thirty (30) years ending at noon on the 14th day of May, 1980. This agreement shall automatically renew for succeeding renewal periods of ten (10) years each unless either party notifies the other at least two (2) years before the end of the initial thirty (30) year period or before the end of the then current renewal period, of the desire of the party giving such notice to terminate this agreement. If such notice is given then this agreement shall terminate at the end of the initial period or the current renewal period during which such notice is given. The term "period of this agreement" as used in this agreement shall mean the initial period and any renewal period or periods."

Plaintiff taxpayer, an Alabama corporation, was organized under another name on December 2, 1955. On March 2, 1956, it purchased all the stock of the Old News. Thereafter, pursuant to a plan of liquidation adopted in accordance with the provisions of the Internal Revenue Code of 1954, the Old News was, on May 31, 1956, liquidated and all its assets were distributed to plaintiff taxpayer, its sole stockholder. The Agency Contract was one of the assets received by the plaintiff taxpayer in the liquidation of the Old News on May 31, 1956, at which time approximately 287.5 months of the initial period of thirty years of the Agency Contract remained. On June 1, 1956, the name of the plaintiff taxpayer was changed to The Birmingham News Company; and on that date the Old News was dissolved.

It has been stipulated as follows:

13. If it be determined that the Agency Contract has an ascertainable life for amortization or depreciation purposes, the parties agree that the amortizable or depreciable basis for the Agency Contract is $3,009,000.

19. The sum of $3,009,000 referred to in paragraph 13 of the Stipulation of Facts (above set forth) does not include any basis for good will or any constituent element of good will. In the determination of said amount of $3,009,000 account was taken only of the portion of the initial period of the Agency Contract from June 1, 1956, to May 14, 1980, both inclusive.

In Bonwit Teller & Co. v. Commissioner, 53 F.2d 381, 82 A.L.R. 325 (2d Cir. 1931), cert. den. 284 U.S. 690, 52 S.Ct. 266, 76 L.Ed. 582, it was held that the taxpayer who in 1911 became lessee under a twenty-one year lease had the right to amortize the value of the lease over the approximately nineteen years of its term remaining after March 1, 1913, despite the fact that the lessee had an option to renew for an additional twenty-one years at a rental to be determined by an appraisal of the property to be made at the time of renewal. In the course of its opinion the Court said:

"Despite the uncertainty of the rental to be paid during the extension, the option may give additional value to the lease, just as many other types of provisions might give the lease value. But it is still true that the property being used in the business (the leasehold) will be exhausted in nineteen years. If the option should

be exercised at the end of the existing term, there will be created a new term (new property) to be thereafter used in the business. The new term, when created, may or may not have value; if it has, allowance for the exhaustion of such new term will be in order. Let it be supposed that the option contained in the lease in question were to purchase the property at the end of the term. Such an option might readily enhance the value of the lease, but it could hardly be supposed to change the period during which the lease will become exhausted. Similarly in the case at bar we see no basis for extending the period of exhaustion beyond the end of the term which was valued."

In Bonwit Teller the Court observed that there was no basis for extending the period of exhaustion beyond the period which was valued. It has been stipulated in this case that in the determination of the taxpayer's basis for the Agency Contract, namely, $3,009,000, account was taken only of that portion of the initial period commencing June 1, 1956, the date of acquisition by the taxpayer, and ending May 14, 1980, the end of the initial period of thirty years. In Bonwit Teller the taxpayer alone had an option to renew the lease, whereas neither the plaintiff nor the Post may by unilateral action renew the Agency Contract beyond the initial period of thirty years. That is to say, a renewal will occur only if both parties concur. The fact that they may indicate their concurrence by withholding notice to terminate is considered immaterial.

Automatic Heating & Cooling Co. v. Commissioner, decided October 20, 1942 (1942 B.T.A. and T.C. Memorandum Decisions, par. 42,561), involved a renewal provision similar to that in the Agency Contract. In 1937 the taxpayer was granted an exclusive franchise for 10½ years, to be

" * * * automatically extended from 1947 [its original termination date], from year to year, provided, however, that either party may, by written notice to the other party, delivered on or before December 31st of any year beginning with the year 1947, terminate this agreement, such termination to take effect on June 30th of the next succeeding year."

The Commissioner contended that this clause rendered the duration of the contract indefinite. In holding otherwise, the Board of Tax Appeals wrote:

"This provision, we believe, is analogous to a renewal option to extend a lease beyond 'the period over which exhaustion of the leasehold is to be spread [where] the renewal privilege had not been exercised and may never be.' Bonwit Teller & Co. v. Commissioner, 53 F.2d 381 [10 AFTR 656], certiorari denied 284 U.S. 690, [52 S.Ct. 266, 76 L.Ed. 582]. Under such circumstances depreciation is to be allowed during the period covered by the lease, the exercise of the option creating a new term. (citing cases) * * * The contract 'grants, * * * for the period ending December 31, 1947, an exclusive franchise * * *' Thereafter, it may be terminated by Automatic [Division of Timken]. Petitioner has no assurance it will not be terminated at that time. The provision, therefore, gives petitioner no more assurance it will have a franchise after December 31, 1947, than would one giving it an option to renew if Automatic [Division of Timken] should see fit to grant a franchise to anyone."

Defendant relies upon Nachman v. Commissioner, 191 F.2d 934 (5th Cir. 1951), Thrifticheck Service Corporation v. Commissioner, 287 F.2d 1 (2d Cir. 1961), and Westinghouse Broadcasting Co. v. Commissioner, 36 T.C. 912 (1961), aff'd 309 F.2d 279 (3rd Cir. 1962). The facts in those cases, however, differ significantly from those existing here.

In Thrifticheck the taxpayer claimed a deduction for depreciation of an amount paid for 200 customer service contracts with individual banks pursuant to which

the taxpayer furnished the banks with a system for the sale of checks. Each contract was for a term of five years and was automatically renewed for a like further term unless either party within a stated time before expiration gave notice of its election to terminate. Each contract contained also a provision for termination by the bank before the end of the contract term. Here, however, neither party can, by unilateral action, terminate the Agency Contract before the end of the initial thirty-year period, Moreover, the contracts involved in Thrifticheck were the very essence of the good will of the taxpayer. None of the plaintiff's basis for the Agency Contract, however, included any basis for good will or any constituent element of good will. In Thrifticheck the Court of Appeals stated that "the combination of provisions for premature cancellation and automatic renewals with the history and prospect of relations continuing beyond the ten years of the initial and first renewal terms, which is here presented, precluded any reasonable determination of a period for amortizing the amounts paid." 287 F.2d at p. 4.

Nor does Nachman v. Commissioner, supra, or Westinghouse Broadcasting Company v. Commissioner, supra, support the Director's position. In Nachman the taxpayer paid $8,000 for a liquor license the cost of which was only $750 and which had less than a year to run. The Tax Court pointed out that the expenditure by the taxpayer was primarily for the purpose of acquiring the expectation of continued renewal of the license and not for the purpose of engaging in the liquor business for only a part of the year for which the license was acquired. Similarly, in Westinghouse the taxpayer paid $5,000,000 for a network affiliation contract having only seven months to run. In that case the Tax Court, citing Nachman, said:

"Only 7 months remained of the then existing term when petitioner purchased the contract. Yet petitioner claims it paid $5 million for this contract. It is incredible that petitioner was not reasonably certain of renewals * * *. Petitioner's witness stated that 'I don't think any prospective purchaser [of a television station] would enter into a contract unless he felt he could get a renewal.' " (36 T.C. 919)

No such situation exists in this case. As the Tax Court pointed out, the taxpayer in Westinghouse "from the first treated this [network affiliation] contract for depreciation purposes different from a contract for a term * * *.

"The fact that the contract conforms to the maximum term permissible under the Federal Communications Commission regulations also suggests that the ostensible term is not necessarily the term contemplated by the parties to such a contract." 36 T.C. 919.

Implicit in the negative finding of the Commissioner that the Agency Contract has no ascertainable life for amortization or depreciation purposes is the positive finding that such contract was reasonably certain of renewal indefinitely. The court is persuaded that that determination was erroneous.

While this court agrees that the right result was reached in Nachman, Thrifticheck and Westinghouse, it is sufficient to observe that tax consequences flow from facts and not from theories. Of course contract renewal provisions ought not to be ignored in determining useful lives of contracts, but that is not to say that, in and of themselves, such provisions are talismanic. Although its citation and discussion of relevant authorities is impressive, the most valuable contribution of the opinion in Westinghouse, insofar as the issue in this case is concerned, is the categorical statement that "[T]he probability of future renewals is a question of fact." (36 T.C. 921).

With respect to the probability of future renewals of this contract, experience in the newspaper industry teaches nothing. If the parties to the contract here involved were not pioneering in such an endeavor, they were certainly among

the first to enter into an experiment stretching over a fixed period of thirty years with neither party having a right, by unilateral action, to terminate it sooner.

Defendant's argument that it is unrealistic to assume that The Post will terminate the Agency Contract in 1980 because it disposed of its plant, equipment, employees (other than editorial employees) when it entered into such contract is countered by the provision of the contract requiring two years' notice to terminate. The abnormal dimension of the required notice clearly indicates that the parties contemplated a renegotiation of the contract terms at the end of its fixed term and provided adequate time for readjustments in the event their negotiations were not fruitful.

The testimony of Harry B. Bradley, formerly Business Manager of plaintiff but now retired, is revealing. In 1953, realizing that three years of the thirty-year term had passed in "the twinkling of an eye," he approached Mark Ferree, General Manager of the Scripps Howard Newspapers, about an extension of such term. Mr. Ferree replied that the Post would not agree to any extension without renegotiating financial terms. There the discussion ended, never to be resumed.

As a general proposition, the fact that either party to a contract which is for a stated and definite period, coupled with a stipulation for automatic renewal, may unilaterally terminate such contract at the end of the stated period by giving a prescribed notice means that both parties must evaluate their contractual arrangement at the end of the stated period in much the same manner as parties to a contract without a provision for renewal. Should the parties agree to continue their contractual relationship, whether or not on the same terms and conditions, each additional period would nonetheless constitute a new term, as if a completely new contract were entered into by the parties. This would not alter the fact that the initial term of such contract was for a definite and fixed period of time. Similarly, if both parties should find the terms of their contract mutually satisfactory so that they remain silent, the continuation of their original contractual arrangement without change makes their original contract no less one with a definite term equal to the initial period.

Thirty years is a long term. It was selected by the parties without reference to any regulation, standard or experience. It is inconceivable that in this era of rapid economic and technological changes one of the parties will not give the two year notice requisite to renegotiation. It seems clear that for purposes of amortization or depreciation the Agency Contract has an ascertainable life of thirty years.

## FINDINGS OF FACT

1. The Agency Contract is an intangible asset which was used by the plaintiff in its business and in the production of income continuously throughout the period of time involved in this action, namely, from June 1, 1956, through December 31, 1958, both inclusive.

2. It can be estimated with reasonable accuracy that the Agency Contract has a useful life for amortization or depreciation purposes which is ascertainable and will expire on May 14, 1980. This coincides with the period to which recourse was had in determining basis. Accordingly, the Agency Contract may reasonably be expected to be of use in the business of the plaintiff or in the production of income for a limited period which does not extend beyond May 14, 1980.

3. The Agency Contract has an ascertainable life for amortization or depreciation purposes, namely, the thirty-year period commencing at noon, May 14, 1950, and ending at noon, May 14, 1980.

4. For the period of 287.5 months commencing June 1, 1956, and ending at noon May 14, 1980, the amortizable or depreciable basis for the Agency Contract is $3,009,000.

5. A reasonable allowance as a depreciation deduction on account of the

Agency Contract for the period June 1, 1956, through December 31, 1956, both inclusive, is the sum of $73,262.63, the said sum being an amount equal to $3,009,000 divided by 287.5 multiplied by 7.

6. A reasonable allowance as a depreciation deduction on account of the Agency Contract for the calendar year 1957 is $125,593.08, the said sum being an amount equal to $3,009,000 divided by 287.5 multiplied by 12.

7. A reasonable allowance as a depreciation deduction on account of the Agency Contract for the calendar year 1958 is $125,593.08, the said sum being an amount equal to $3,009,000 divided by 287.5 multiplied by 12.

## CONCLUSIONS OF LAW

1. In the determination of the plaintiff's net taxable income for the periods involved in this action, the plaintiff is entitled to a reasonable allowance as depreciation deductions for the exhaustion of the Agency Contract.

2. In determining the plaintiff's net taxable income for the year 1956, the plaintiff is entitled to an allowance of $73,262.63 as a depreciation deduction on account of the Agency Contract for the period June 1, 1956, through December 31, 1956, both inclusive.

3. In determining the plaintiff's net taxable income for the year 1957, the plaintiff is entitled to an allowance of $125,593.08 as a depreciation deduction on account of the Agency Contract for the calendar year 1957.

4. In determining the plaintiff's net taxable income for the year 1958, the plaintiff is entitled to an allowance of $125,593.08 as a depreciation deduction on account of the Agency Contract for the calendar year 1958.

5. The plaintiff is entitled to recover from the defendant $44,373.63 for the year 1956 with interest thereon as allowed by law from December 14, 1959.

6. The plaintiff is entitled to recover from the defendant $72,150.57 for the year 1957 with interest thereon as allowed by law from December 14, 1959.

7. The plaintiff is entitled to recover from the defendant $68,232.08 for the year 1958 with interest thereon as allowed by law from December 14, 1959.