Reviewed by the Court.

TOLEDO TV CABLE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

NEWPORT TV CABLE CO., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT [1]

Docket Nos. 861–69, 862–69. Filed March 29, 1971.

*George L. Kirklin, John H. Doran,* and *James D. Tredup,* for the petitioners.

*Lee A. Kamp* and *Gary R. DeFrang,* for the respondent.

STERRETT, *Judge:* Respondent determined deficiencies in the petitioners' Federal corporation income taxes as follows:

| | TYE Oct. 31— | Deficiency |
|---|---|---|
| Toledo TV Cable Co., docket No. 861–69 | 1966 | [1] $2,560.62 |
| Newport TV Cable Co., docket No. 862–69 | 1963 | 3,726.94 |
| | 1964 | 4,628.88 |
| | 1965 | 5,834.52 |
| | 1966 | 5,034.10 |

[1] Although by reason of a net operating loss deduction the respondent determined a deficiency for 1966 only, the statutory notice also covers Toledo Cable's taxable years ended Oct. 31, 1963, 1964, and 1965.

The sole issue for decision is whether the respondent erred in determining that certain municipal franchises pertaining to community antenna television (hereinafter referred to as CATV) have an indeterminate useful life and that therefore the costs allocable thereto are not depreciable under section 167 (a) of the Internal Revenue Code of

[1] These cases were consolidated for purposes of trial, briefing, and opinion pursuant to joint motion of the parties.

1954.[2] Subsidiary issues concerning the amounts of net operating losses and investment credits will be resolved by our decision as to depreciation of the franchises.

FINDINGS OF FACT

Some of the facts were stipulated. The stipulations and the exhibits attached thereto are incorporated herein by this reference.

Toledo TV Cable Co. (hereinafter referred to as Toledo Cable) was incorporated under the laws of the State of Oregon on November 1, 1962, and maintained its principal place of business at Newport, Oreg., at the time its petition was filed herein. For its taxable years ended October 31, 1963, through October 31, 1966, inclusive, Toledo Cable filed its Federal corporation income tax returns with the district director of internal revenue at Portland, Oreg.

Newport TV Cable Co. (hereinafter referred to as Newport Cable) was incorporated under the laws of the State of Oregon on November 1, 1962, and maintained its principal place of business in Newport, Oreg., at the time its petition was filed herein. Newport Cable filed its Federal corporation income tax returns for the taxable years ended October 31, 1963, through October 31, 1966, inclusive, with the district director of internal revenue at Portland, Oreg.

For each of the years in controversy Toledo Cable and Newport Cable maintained their books and records and prepared their Federal corporation income tax returns upon the basis of a fiscal year ending October 31, and the accrual method of accounting. During the years in issue the officers of Toledo Cable and Newport Cable were as follows: President, Ray F. Siegenthaler (hereinafter referred to as Siegenthaler) ; vice president, Edwin Cone (hereinafter referred to as Cone) ; and secretary-treasurer, William D. Elkins (hereinafter referred to as Elkins).

CATV systems distribute television and other signals by cable to subscribers in communities, or areas within communities, where normal reception may be impaired by distance or physical barriers, such as mountains, tall buildings, or environmental conditions. The signals originate from local and distant television broadcasting stations and are received off the air by means of high antenna or by microwave relay. The received signals are amplified and distributed on a community-wide cable distribution network to the premises of subscribers for reception by individual television sets connected to the system.

Systems typically offer signals of stations carrying all three national television networks and independent and educational stations (both

---

[2] All references by section are to the Internal Revenue Code of 1954 unless otherwise stated.

VHF and UHF) as can be received at the antenna site, and of FM radio. Frequently, a CATV system has sufficient channel capacity to permit distribution to subscribers of programs and services that are originated by the system. Such locally originated programs which are not available to nonsubscribers may consist of news, weather reports, stock market information, and live, filmed, or video-taped programs of a public service or entertainment nature. The subscriber thus benefits from an enlarged choice of television stations and programs as well as improved reception without the use of a rooftop antenna. It is generally conceded that color television reception is enhanced by cable television. The residents of communities served by a system avail themselves of the service by becoming subscribers and paying a fixed monthly service fee, and, in most cases, an initial connection charge.

CATV operations are generally conducted pursuant to the terms of a franchise granted by the local governing body of the area to be served. Such local franchises are generally nonexclusive and are granted for a stated term, usually on the order of 10 to 25 years. The franchises normally require payment of an annual franchise fee which is determined in most cases as a percentage of revenues. Monthly service charges and other conditions of services are sometimes specified in the franchise, with changes and modification subject to approval of local governing bodies. CATV systems generally enter into joint use or pole-rental agreements with the electric and/or telephone utilities serving the area for which a rental is paid to the respective owner. System construction practices must comply with national, State, and local electrical and safety codes, and with the regulations of the Federal Communications Commission.

A CATV system consists of a number of connecting sections which may be characterized as the reception, head-end, and distribution systems. At the reception point are located the towers, antennas, microwave receivers and other necessary equipment to receive the broadcast signals. The head-end section consists of the electronic equipment used to convert, modify, and modulate the signal bearing the intelligence received at the antenna before traveling into the wire distribution system. The distribution system consists of trunk lines which originate at the head end and may be branched repeatedly to reach different sections of the system, the smaller distribution cables which carry the signal to the immediate vicinity of the subscriber, and the "drop" wires which carry the signals from the distribution cable to a terminal block on the permises of the individual subscriber. The final link in the system is the cable extending from the terminal block to the television set of the subscriber.

Toledo, Oreg., is approximately 35 miles from the nearest television stations at Corvallis, Oreg., with a population of 3,050. It is not possible to receive television signals in Toledo without the aid of a CATV system.

On September 6, 1955, the City Council of Toledo adopted ordinance No. 635 granting Edward J. Phillips and C. E. McKenzie, doing business as PMC–TV Service, and its successors and assigns, a nonexclusive franchise to install, maintain, and operate a CATV system in, over, upon, and under the streets, alleys, and public highways of Toledo. The franchise was for a 10-year period with an option to renew for an additional 10-year period. The ordinance provided that if the grantees did not commence construction within a reasonable time the franchise would sooner terminate. As consideration for the franchise the grantees were to a pay a fee of 1½ percent per annum of "gross local service receipts."

Prior to 1956, PMC–TV sold its CATV system to Howard W. and Edith P. McClure, doing business as a partnership under the name of Mac's Television & Electronics.

On November 1, 1962, Siegenthaler and Elkins purchased the assets and business of Mac's Television & Electronics for a lump-sum purchase price of $200,000.[3] Of this amount, respondent admitted that $112,785 was properly allocable to the CATV franchise. At the time of the sale, Mac's Television & Electronics had 772 subscribers. The monthly fee for noncommercial users was $4.

On November 1, 1962, Siegenthaler and Elkins formed Toledo Cable and contributed the assets acquired from the McClures in exchange for the stock of the corporation.

Newport, Oreg., has a population of 5,344 and is located on the seacoast in the northwest section of Oregon. Newport is not served by a local television station but receives signals of three television stations situated in Portland, Oreg., and one television station situated in Eugene, Oreg. The signals for all four stations are transmitted on VHF channels and are received and rebroadcast in Newport on UHF channels by means of frequency "translators" owned and operated by a local Newport firm. The Portland television stations are approximately 86 miles from Newport, and the Eugene station is approximately 57 miles from Newport.

On October 29, 1962, Siegenthaler and Elkins purchased all of the outstanding stock of Magee Television Co., Inc., from its two stock-

---

[3] The parties stipulated to a purchase price of $200,000 paid as a lump sum; however, it appears from the sales agreement, as well as an escrow agreement, that payments of $1,000 for 200 consecutive months, to commence when Howard W. McClure retired from the business, were contemplated. As security for the purchase price it was agreed that all of the stock of the corporation that Siegenthaler and Elkins planned to form would be placed in escrow. The pledge of stock relieved the purchasers of personal liability.

holders, Ernest A. Magee and Bernice M. Magee, husband and wife, for $300,000. At the time of the sale of stock, Magee Television was operating a community antenna television system (CATV) in Newport, Oreg., under a nonexclusive franchise granted by the City Council of Newport on December 21, 1959. Ordinance No. 582, which authorized and in reality constituted the franchise, contained provisions similar to those in the Toledo ordinance with two exceptions. The Newport ordinance provided a franchise for a term of 10 years commencing on January 1, 1960, with no option to renew and the fee payable to the City of Newport was $250 per annum. Relevant sections of Newport ordinance No. 582 are set forth in the margin.[4]

On October 29, 1962, Magee Television had 962 subscribers. During the year 1962 each noncommercial user paid a monthly fee of $3.85.

On or about November 1, 1962, Magee Television was dissolved and the assets of the liquidated corporation were contributed to Newport Cable by Siegenthaler and Elkins in exchange for 400 of 500 shares of capital stock outstanding. Edwin E. Cone and Walter A. Hummel each received 50 shares of Newport Cable stock.

---

[4] SECTION 1. There is hereby granted by the City of Newport to Magee Television Co. Inc., its successors and assigns, the right and privilege of providing a community television antenna system and to place, erect, lay, amintain [sic] and operate in upon and under the streets, alleys, avenues, thoroughfares and public highways within the City of Newport, poles, wires, and other appliances and conductors for such community television antenna system. Such wires and other appliances and conductors may be strung upon poles or other fixtures above ground, or at the option of the grantee, its successors and assigns, may be laid underground in pipes or conduits or otherwise protected, and such other apparatus may be used as may be necessary or proper to operate and maintain the same.

SECTION 2. Said Magee Television Co. Inc. shall fully comply with all the terms of its contract with the Pacific Telephone and Telegraph Company and the Central Lincoln Peoples Utility District under date of February 1, 1955, and shall make full use of all facilities embraced in said contract in the operation, installation and maintenance of its co-axial cable.

SECTION 3. It shall be lawful for said Magee Television Co. Inc., its successors and assigns, to make all needful excavations in any such streets, alleys, avenues, thoroughfares and public highways in said City for the purpose of placing, erecting, laying and maintaining poles, or other supports or conduits for said wires or repairing, renewing, or replacing the same. Said work shall be done in compliance with the necessary rules, regulations, ordinances or orders, which may, during the continuance of this franchise, be adopted from time to time by the City of Newport.

SECTION 7. In consideration of the rights, privileges, and franchise hereby granted, said grantee, Magee Television Co. Inc., its successors and assigns, shall pay to the City of Newport the sum of Two Hundred & Fifty Dollars ($250.00) annually in advance during the term hereof and any extension thereof, which said payment shall be in lieu of and shall include any and all City Business License Fees which might be assessed against said grantee during said term.

SECTION 8. The rights, privileges and franchise herein granted shall continue and be in force from January 1, 1960, and renewed and extended for the period or periods as set forth in Paragraph 32 of said contract between the Pacific Telephone and Telegraph Company and Central Lincoln Peoples Utility District, and Magee Television Co. Inc., but in no case to extend beyond January 1, 1970.

SECTION 11. That rates for the Services to be furnished by the said Magee Television Co. Inc., shall be submitted to the City Council of the City of Newport for its approval and should the said parties not be able to agree on the rates to be charged, the said parties shall submit the matter for arbitration.

SECTION 12. No assignment of this franchise either in whole or in part shall be made by the said Magee Television Co., Inc., without the approval of the City Council.

On November 5, 1962, the Newport City Council approved the transfer of the franchise to Siegenthaler and Elkins.

The terms of the purchase of the system were an initial payment of $15,000 on November 1, 1962, and monthly payments thereafter of $2,500 commencing on December 15, 1962. In fact $17,500 was paid upon closing. Of the total purchase price of $300,000 the respondent has admitted that $204,740 is properly allocable to the cost of the franchise. One of the factors used by Siegenthaler and Elkins in arriving at the purchase price was a projection of the net income of Magee Television over a period of 12 to 14 years.

As security for the payment of the purchase price Siegenthaler and Elkins agreed to deposit with an escrow agent the stock of Magee Television Co. In the event that Magee Television was dissolved, the stock of any successor corporation was to be deposited relieving Siegenthaler and Elkins of personal liability.

In the cases of both purchases, payment by Siegenthaler and Elkins was extended over a period in excess of the franchise periods. Siegenthaler and Elkins had no capital and it was necessary to spread the payments out in order to facilitate payment out of gross profits.

Since November 1, 1962, the Toledo and the Newport CATV systems have been operated jointly. In the winter of 1963 property was acquired in Newport and the joint office of Toledo Cable and Newport Cable was established there. To finance this purchase Toledo Cable borrowed $6,000 and charged Newport Cable $65 per month rental. There was one manager for both systems. The signals received by the antenna at Toledo were superior to those at Newport. Since the cities were only 6 miles apart the systems were connected by an interconnecting line and an antenna approximately 2 miles northeast of Toledo was used. To finance construction of this interconnection Toledo Cable secured a loan of $15,000 and rented use of the line to Newport Cable for $250 per month. Construction of the intertie line was completed in April of 1963.

The physical condition of the facilities at Toledo and Newport was poor at the time of acquisition. And, therefore, the quality of service in both cities left a lot to be desired. Both systems could carry no more than five television channels and no FM radio. By 1964 it was decided that little was to be gained by maintenance and minor improvement and that the best course would be to completely rebuild the systems. The anticipated cost of rebuilding was in excess of $150,000. In order to finance this undertaking Siegenthaler and Elkins sought to borrow funds repayable over a 10-year period. In order to procure this sort of arrangement and in order to earn a profit, it was felt that new franchises were desirable. Siegenthaler and Elkins decided that, if new franchises could not be obtained, the petitioners would reduce

operating expenses as much as possible and refrain from capital improvements.

In September of 1964 Toledo Cable did purchase new head-end equipment for $6,031.03, and in October of the same year Newport Cable installed a new addition to its cable system at a cost of $5,210.84.

On October 15, 1964, Siegenthaler wrote to the City Councils of Toledo and Newport for the purpose of securing new franchises. Toledo Cable and Newport Cable offered identical proposals to the City Councils of Toledo and Newport, respectively. Each corporation sought a 20-year franchise and offered to pay the municipality 3 percent of the gross service revenue. In addition Toledo Cable and Newport Cable sought authority to carry radio signals.

In its consideration of the franchise proposed by Toledo Cable, the City Council of Toledo noted in its minutes of meetings held on October 19, 1964, and November 2, 1964, that the City did not receive adequate television reception, the council was not in favor of a 20-year "lease," and that the company should provide a local office. At the meeting of November 2, 1964, the matter of Toledo Cable's application was tabled until the company would provide specific information regarding improvements to be made on the CATV system.

At the January 18, 1965, meeting of the Toledo City Council, Elkins presented the council with specific information as to planned improvements of Toledo Cable's CATV system. The council voted to approve Toledo Cable's application provided that a schedule of the planned improvements would be included in the new franchise and that the City would receive a 3-percent fee.

At the meeting of the Toledo City Council held on February 1, 1965, the following was noted in the minutes:

The City Manager read a draft of an ordinance which would grant a new permit to the Toledo TV Cable Company. The proposal will be submitted to the company and council for approval at a later date, and contained conditions of the contract, including a 3% payment of the company's gross receipts to the city, equipment to be updated at all times, a review at the end of 10 years to reject or continue the permit, restrictions on selling or transferring the ownership of the company without permission of the city and specifying that no advertising be carried other than that picked up in signals transmitted by other television and radio stations.

At this meeting Ron Phillips, manager of Newport Radio Station KNPT, speaking for his and Toledo's Station KTDO, stated approval of a policy of improvement of the CATV system, but requested that Toledo Cable be required to carry the signals of the two radio stations if it were permitted to carry other radio signals.

At the Toledo City Council meeting held on March 15, 1965, Siegenthaler withdrew Toledo Cable's application for a new franchise. The management of Toledo Cable decided upon this action

because it was felt that a new franchise of the kind desired would not be approved. At this meeting Siegenthaler exercised Toledo Cable's option under ordinance No. 635 to renew its franchise for an additional 10 years commencing September 5, 1965, and a fact-finding committee (including Siegenthaler) was appointed to attempt to draft a franchise acceptable to the parties involved.

On May 27, 1968, the City Council of Toledo adopted ordinance No. 851 which granted Liberty Television, Inc., doing business as Toledo Cable, a franchise for CATV.[5] The franchise granted by ordinance No. 851 was nonexclusive, for a period of 10 years, with an option for an additional 10-year renewal, at which time the franchise fee was subject to renegotiation. The new franchise fee was 3 percent of gross local service receipts. The new franchise contained standards for service and provided the City with authority to promulgate pertinent regulations. In addition Toledo Cable was required to establish a local office where customers might pay their bills. The new franchise provided for the distribution of radio signals.[6] The new franchise was granted after the rebuilding of the CATV system which was completed in 1967.

As stated above, on October 15, 1964, Newport Cable instituted its application for a new franchise. In its negotiations with and before the City Council of Newport, Newport Cable encountered substantially the same objections that Toledo Cable was encountering with respect to its franchise application. The owner of the local radio station contended that Newport should be prohibited from carrying radiobroadcasts or, in the alternative, that his radiobroadcasts should be carried in a "very prominent position." He also contended that Newport Cable should be prohibited from carrying advertising. The attorney for the local radio station suggested that the matter of the franchise should be opened for bidding and that his client would like to bid. Questions were raised as to the length of the franchise period. It was felt that 20 years was too long. The city attorney of Newport was concerned with granting a franchise of over 10 years. In addition, during the discussions before the City Council of Newport questions were raised concerning the quality of service provided by Newport Cable. Future improvement of the CATV system was considered and good service was more important to the council than the amount of the franchise fee. The City Council inquired of other Oregon cities as to the terms of similar franchises, as to the quality of serv-

---

[5] On Nov. 23, 1966, Newport Cable and Toledo Cable, as well as several other CATV corporations, became merged with Liberty Television, Inc.

[6] Ordinance No. 851 was considerably more detailed than ordinance No. 635, and we have described only those provisions materially different from No. 635. See our discussion of Newport ordinance No. 683, *infra.*

ice these cities were receiving from CATV, and as to the amounts of fees charged.

On January 4, 1965, ordinance No. 683 was introduced and passed to first and second readings. On March 1, 1965, the City Council of Newport adopted ordinance No. 683 granting Newport Cable a nonexclusive franchise for a period of 10 years. At the end of 10 years Newport Cable had an option to renew for an additional 10 years if—

on or before March 1, 1967, [it] shall have substantially rebuilt the existing coaxial cable system, shall have installed amplifiers having the capacity of handling twelve (12) television channels, and shall then be supplying its subscribers with the signals of all television stations whose signals at the Grantee's antenna site shall produce pictures which are relatively snow-free and not objectionably ghosty, * * *

Ordinance No. 683 provided that Newport Cable could not originate any advertising. There was no provision permitting the system to carry radiobroadcasts.

As was the case with the Toledo franchise, the company could not transfer its facilities or its rights under the franchise without council approval, and subscriber rates were subject to examination by the City, which could direct "fair and reasonable" charges. In addition, in the Toledo and Newport franchises proposed rate changes by the companies were subject to approval by the respective cities.

Ordinance No. 683 required Newport Cable to furnish service wherever the demand was great enough to justify the cost. The council retained the right to make this determination and if the grantee failed to comply the franchise could be terminated. The City reserved the right to make use of Newport Cable's poles for police and fire alarm systems free of charge, but to the company's specifications. The City was to have access to Newport Cable's plans, contracts, books, and records, and the company was required to file copies of its rules and regulations, its rate schedule, and a summary report of gross revenues.[7] The franchise fee was set at 3 percent of local gross service receipts.

Prior to March 20, 1967, Newport Cable approached the City Council of Newport with regard to amending ordinance No. 683 to allow the transmission of radio signals and to allow original advertising. The owner of the local radio station objected to these proposed amendments.

On March 20, 1967, the City Council of Newport adopted ordinance No. 750, which amended ordinance No. 683, to permit transmission of radio and to permit advertising.

Section 221.460, Ore. Rev. Stat. (1953), provides that a municipality may not grant a franchise for a longer term than 20 years.

---

[7] Toledo ordinance No. 851 also contained provisions substantially identical to those set forth in the paragraph above.

On its original Federal corporation income tax returns for the taxable years ended October 31, 1963, October 31, 1964, and October 31, 1965, Toledo Cable allocated $75,000 of its $200,171.83 basis in the assets received from Siegenthaler and Elkins to goodwill. No depreciation was claimed on these returns for the cost attributable to the intangible assets included within this category.

On its amended income tax returns for the taxable years ended October 31, 1963, October 31, 1964, and October 31, 1965, which were filed on May 5, 1967, Toledo Cable reallocated its $200,171.83 basis in the assets as follows: Toledo franchise—$112,785; goodwill—$0; other assets—$87,386.83.

On its original Federal corporation income tax returns for the taxable years ended October 31, 1963, October 31, 1964, and October 31, 1965, Newport Cable allocated its $300,000 basis in the assets received from Siegenthaler and Elkins upon the dissolution of Magee Television Co. as follows: Land and tangible depreciable assets, $225,000; goodwill, $75,000. On these returns, all of the costs which had been allocated to intangible assets were included within the category of goodwill. No depreciation was claimed on these returns for the cost attributable to the intangible assets included within this category.

On its amended income tax returns for the taxable years ended October 31, 1963, October 31, 1964, and October 31, 1965, filed on May 5, 1967, Newport Cable reallocated its $300,000 basis in the assets as follows: Newport franchise—$204,740; goodwill—$0; other assets—$95,260. On their amended returns Toledo Cable and Newport Cable claimed depreciation deductions with respect to their respective franchises.

The respondent in his notices of deficiency to both petitioners stated his determination that no depreciation deductions were allowable with respect to the cost of the franchises as follows:

the price paid for goodwill and other intangibles, is not depreciable because the good will and other intangibles have an indeterminate useful life.[8]

OPINION

Section 167(a)(1) provides a deduction for depreciation of property used in the taxpayer's trade or business.[9] An intangible asset may be the subject of a depreciation allowance if it is of use in a

---

[8] As we stated above the respondent has admitted the amounts allocable to the cost basis of the franchises in question. Therefore we need not be concerned with questions pertaining to goodwill or other nondepreciable intangibles.

[9] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

trade or business for a limited time. "An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation." Sec. 1.167(a)–3, Income Tax Regs. Section 167(a) "has been construed as permitting a reasonable allowance for the depreciation of an intangible asset only if its duration can be ascertained with 'reasonable certainty' or 'reasonable accuracy.'" *Gulf Television Corp.*, 52 T.C. 1038, 1056–1057 (1969).

With respect to the instant case it is Toledo Cable's position that for the taxable years in issue it is entitled to an allowance for the depreciation of its franchise computed on the basis of a useful life commencing on November 1, 1962, the date of acquisition, and ending on September 6, 1975, the date upon which the franchise together with a 10-year renewal was to expire. The other petitioner, Newport Cable, takes the position that its franchise is depreciable for the fiscal years ended October 31, 1963, and October 31, 1964, upon the basis of useful life commencing November 1, 1962, the date of acquisition, and ending on January 1, 1970, the date upon which its original franchise was to terminate. Since Newport Cable acquired a new 10-year franchise, with a 10-year renewal option, on March 1, 1965, it claims that this franchise is depreciable for the fiscal years ended October 31, 1965, and October 31, 1966, on the basis of a useful life ending on March 1, 1985.

With respect to both petitioners, it is the respondent's position that no deduction for depreciation was allowable for any of the years in question because it was reasonably probable that the franchises would be renewed indefinitely; hence, their useful lives could not be estimated with reasonable accuracy.

It is our task here to determine whether the respondent erred in his basic premise; i.e., it was reasonably probable that the franchise would be renewed indefinitely. The probability of future renewals is a question of fact. *Westinghouse Broadcasting Co.*, 36 T.C. 912, 921 (1961), affd. 309 F. 2d 279 (C.A. 3, 1962). The determination is to be made in accordance with the facts known or reasonably anticipated at the end of the period for which the return is filed. *New England Tank Industries, Inc.*, 50 T.C. 771, 781 (1968), affirmed per curiam 413 F. 2d 1038 (C.A. 1, 1969); *Pasadena City Lines, Inc.*, 23 T.C. 34, 39 (1954). The petitioners have the burden of proving the respondent's determination erroneous. They must show more than uncertainty as to the franchises' useful lives. *Westinghouse Broadcasting Co.*, supra at 921.

The instant cases present a close factual question. As is frequently the situation, neither party presented overwhelming evidence in support of its position. The basic, objective facts were largely agreed upon; however, the more subjective interpretation of these facts was

hotly contested; i.e., whether negotiations, changes in franchises, opposition to renewals, etc., were substantial and/or material. Both parties are to be congratulated upon the caliber of the briefs filed on behalf of their respective positions.

The facts pertaining to Newport Cable are, with minor exceptions, representative of the cases of both petitioners, hence, only incidental reference will be made to the facts surrounding Toledo Cable's franchise. On October 29, 1962, Siegenthaler and Elkins purchased the stock of Magee Television Co. for $300,000, $17,500 was paid on November 1, 1962, and the sale agreement provided for monthly payments of $2,500 commencing on December 15, 1962. This of course would mean that the final installment would fall due in early 1972, over 9 years later. As security for the purchase price the sellers were to look solely to the stock of a new corporation, formed on November 1, 1962 (Newport Cable). At the time of sale Magee Television Co. was operating a CATV system in Newport, Oreg., under a 10-year, nonexclusive franchise from the City. On October 29, 1962, the franchise had approximately 7 years remaining prior to expiration.[10] The franchise fee payable to the City of Newport was $250 per annum.[11] The franchisee could not originate advertising nor broadcast radio signals. During 1962 Magee Television had 962 subscribers paying a monthly fee of $3.85.[12]

At the time Siegenthaler and Elkins purchased the stock of Magee Television the company's physical assets were in poor condition. By 1964 it was decided to completely rebuild the system as well as that of Toledo Cable. The anticipated cost of this program for both franchises was in excess of $150,000 and in order to secure financing it was felt that new franchises for both were desirable.

On October 15, 1964, Siegenthaler wrote to the Newport City Council proposing a new 20-year franchise with a fee of 3 percent of gross service revenue. Siegenthaler also proposed that Newport Cable be permitted to originate advertising and to carry radio signals.

In its negotiations with and before the Newport City Council, several objections were made with respect to Newport Cable's proposal. The Newport city attorney felt that any new franchise should be limited to 10 years. Questions were raised concerning the quality of the service Newport Cable provided. The owner of the local radio station contended that Newport Cable should not be permitted to originate advertising nor to carry radio signals, or, in the alternative, should be required to carry the local radio station in a "prominent

---

[10] Concerning the Toledo franchise, on the date of acquisition there were approximately 13 years remaining prior to expiration. This includes a 10-year option for renewal.

[11] The Toledo fee was 1½ percent of local service revenue, or approximately $556 for 1962.

[12] At the time of the acquisition of the Toledo franchise Mac's Television & Electronics had 772 subscribers paying $4 per month.

position." The attorney for this station stated that his employer would like to see the matter of the franchise opened for public bidding and would like to bid.[13]

On March 1, 1965, the City Council of Newport adopted ordinance No. 683 granting Newport Cable a nonexclusive franchise for CATV. At the end of 10 years Newport Cable had an option to renew for an additional 10 years provided that it had "substantially" rebuilt the CATV system and could conform to certain standards of performance. The franchise fee was set at 3 percent of local gross service receipts, as Newport Cable had proposed. Ordinance No. 683 contained several other material provisions which we will discuss, *infra*.[14]

It cannot be questioned that in determining the probability of future renewals we are not limited in our consideration to the number and term of possible renewals set forth in the franchise documents. The contract provisions are not "in and of themselves * * * talismanic." *Birmingham News Co.* v. *Patterson*, 224 F. Supp. 670, 676 (N.D. Ala. 1963), affirmed per curiam 345 F. 2d 531 (C.A. 5, 1965). At the other end of the spectrum we can not equate these cases with the decisions in *Commissioner* v. *Indiana Broadcasting Corporation*, 350 F. 2d 580 (C.A. 7, 1965), reversing 41 T.C. 793 (1964); *Gulf Television Corp.*, *supra;* and *Westinghouse Broadcasting Co.*, *supra*, in which network affiliation contracts were automatically renewable unless one of the parties thereto gave notice.[15] Nor do we find cases such as *KWTX Broadcasting Co.*, 31 T.C. 952 (1959), affirmed per curiam 272 F. 2d 406 (C.A. 5, 1959); *V. P. Shufflebarger*, 24 T.C. 980 (1955); and *Morris Nachman*, 12 T.C. 1204 (1949), affd. 191 F. 2d 934 (C.A. 5, 1951), persuasive. In these cases evidence well established that the particular governmental agency involved made a practice of granting renewals.

On brief the petitioners rely heavily upon *Birmingham News Co.* v. *Patterson*, *supra*, for the proposition that a contract which is subject to "some substantial renegotiation" after the term of the contract has a determinable useful life. *Birmingham News Co.* involved a contract between two newspapers for a 30-year period. At the end of the 30 years the contract would be automatically renewed for successive 10-year periods, unless either party gave notice 2 years prior to the end of the initial 30-year period or before the end of the current 10-year renewal period. The District Court held that the contract had a 30-year

[13] The opposition faced in Toledo by Toledo Cable was of substantially identical character.

[14] As we detailed in our Findings of Fact Toledo Cable also instituted franchise renewal proceedings on Oct. 15, 1964; however, when it felt that a new franchise of the kind desired would not be forthcoming Toledo Cable withdrew its application and exercised its option to renew. On May 27, 1968, ordinance No. 851 was adopted by the Toledo City Council granting Toledo Cable a new franchise.

[15] Whether a particular case deals with a franchise, a contract, or a lease is immaterial. See *Gulf Television Corp.*, 52 T.C. 1038, 1058 (1969).

useful life. The 2-year notice requirement, in addition to other testimony, and the length of the contract itself, indicated to the court that renegotiation was probable and that a renewal would be tantamount to a new contract. The petitioners on brief state that we have approved this emphasis on renegotiation, citing *David Hoffman*, 48 T.C. 176 (1967).

We feel that the petitioners' reliance upon *Birmingham News Co.* v. *Patterson, supra,* is misplaced. The principle to be distilled from the case is that the question of future renewals is a question of fact and renegotiation is one of the factors to be considered. While *Birmingham News Co.* provides useful guidelines, the case is factually disparate from the instant case and is not dispositive. In addition, in view of the court's statement, 224 F. Supp. at 677, that if the parties agree to continue their contractual relationship it would be "as if a completely new contract were entered into by the parties," it may be that new consideration depreciable over the term of the renewal was contemplated; a factor impossible to determine from the court's opinion. Furthermore, in *David Hoffman, supra* at 177–178, this was the case; upon each "renewal" new consideration was required. This fact, of course, renders *Hoffman* completely inapposite. Finally, in *Hoffman, supra* at 178, we cited *Birmingham News Co.* v. *Patterson;* however, our citation was preceded by the signal "cf." which hardly connotes approval. See A Uniform System of Citation, p. 87 (11th ed.).

As we imply above, we have been unable to find a decided case the facts of which are sufficiently close to those at bar as to be controlling. The decisions in the area, however, do provide helpful guidelines in making the necessary factual determination of the reasonable probability of future renewals. After careful consideration of the record and study of the prior decisions, it is our holding that the petitioners have failed to show that it was not reasonably probable that the franchises of Toledo Cable and Newport Cable would be renewed indefinitely.

It is a fair inference from the facts, as we found them, that Siegenthaler and Elkins at the time of the acquisitions of the two franchises in question would have reasonably anticipated future renewals. With respect to Newport Cable, Siegenthaler testified that in arriving at a purchase price for the stock of Magee Television Co. income projections were made over a period of 12 or 14 years, despite the fact that the Newport franchise had only 7 years remaining. Furthermore, although we appreciate the fact that Siegenthaler and Elkins desired to spread the purchase price over a considerable period of time because they had little capital, we feel it is of some significance that the terms of purchase extended in excess of 2 years beyond the pertinent franchise. Parenthetically, we would note that this conclusion is supported by

the fact that the former owners of Magee Television Co. accepted stock of Newport Cable as the sole security for the purchase price and it is a fair inference to say that they must have contemplated renewal of the franchise in order to feel assured of receiving their full consideration. The terms of purchase with respect to the Toledo franchise insofar as extending beyond the applicable franchise period are closely parallel.

As further evidence that Siegenthaler and Elkins reasonably anticipated future renewals of Toledo Cable's and Newport Cable's franchises is the fact that both cable systems were in poor condition at the time of the purchases. With the initial purchases Siegenthaler and Elkins agreed to pay in excess of $500,000 and must have been cognizant of the fact that additional expenditures would follow. By 1964 the petitioners had decided to completely rebuild the cable systems at an anticipated cost in excess of $150,000. We are convinced that the petitioners must have been aware of this future cost and that Siegenthaler and Elkins as astute businessmen would have been reluctant to invest time or money without a reasonable expectation of future renewals. We do not feel that these circumstances have the same impact as the situation in *Westinghouse Broadcasting Co.*, *supra* at 919, had, where the petitioner claimed it paid $5 million for the 7-month remainder of a 2-year network affiliation contract. See also *Morris Nachman*, *supra* at 1208. It is clear, however, that the petitioners did contemplate future renewals.

In our Findings of Fact we stated that certain capital expenditures were undertaken by the petitioners prior to the acquisition of franchise renewals. The respondent on brief urges us to infer that these expenditures indicated the petitioners' assurance that new franchises would be secured. While we do not, perhaps, attach the same significance to these expenditures as respondent, we do feel that they have some probative value of the petitioners' corporate state of mind.

As we stated above the petitioners direct the main thrust of their arguments towards demonstrating that in order to obtain renewals it was necessary to undertake substantial negotiation against strong opposition. This may have great significance in cases such as *Birmingham News Co.* v. *Patterson*, *supra*, in which a renewal period the taxpayer sought to disregard was provided by contract. In the case at bar, however, renegotiation is, merely, evidence in the petitioners' attempt to prove that future renewals were not a reasonable probability. In any case we find that the negotiations, as well as the opposition to petitioners' proposals set forth in our Findings of Fact, were not of sufficient scope or vehemence as to carry the petitioners' burden of proof.

The opposition that the petitioners encountered was not to the requested franchise per se, but was to specific provisions thereof. In fact

the provisions which were most strenuously objected to were improvements, from the petitioners' points of view, upon the original franchises. The petitioners were seeking a 20-year term, authorization to carry radio signals, and to originate advertising. We do not think it appropriate for the petitioners to propose more advantageous terms and then to rely on rejection of these terms in showing opposition to their requests for new franchises. There is nothing in the record to indicate that if the petitioners had proposed new franchises upon the original terms the same degree of opposition would have been encountered. Aside from one suggestion to the Newport City Council from the attorney of the owner of the local radio station that the matter of the franchise should be opened for bidding, there was no opposition to the granting of a franchise—only the granting of a 20-year term and to the proposals concerning radio and advertising.

In *Pasadena City Lines, Inc., supra* at 39, we said:

In the instant case, during the taxable years here in issue, no renewal of petitioner's franchise had been arranged, nor does the record indicate that one was then being negotiated.

That situation was unlike the one we are faced with here. On October 15, 1964, both Toledo Cable and Newport Cable began negotiating for new franchises. On March 1, 1965, during one of the years in question, Newport Cable secured a new franchise. On March 15, 1965, Siegenthaler withdrew Toledo Cable's application.

In the case of Newport Cable, the new franchise would seem to indicate that for Newport's taxable years ended October 31, 1965 and 1966, there was a reasonable probability of future renewals or new franchises beyond that renewal contained in the new franchise. Concerning the years ended October 31, 1963 and 1964, even though the determination is to be made in accordance with facts known or reasonably anticipated at the end of the period for which the return was filed (*New England Tank Industries, Inc.*, supra at 781), the new franchise is at least some evidence of reasonably probable future renewals.

With respect to Toledo Cable, the fact that Siegenthaler withdrew its application is not indicative of difficulty in negotiation. On February 1, 1965, the City Council of Toledo noted in its minutes that it was willing to offer a new franchise which appeared similar, in its provisions, to Toledo Cable's original franchise. Toledo Cable withdrew its application not because it felt it could procure no franchise, but rather because it could not secure a franchise on its terms. In point of fact the Toledo City Council placed Siegenthaler on a fact-finding committee in order to aid in arriving at an acceptable franchise. This cooperative attitude certainly belies petitioners' arguments that negotiations were difficult. In May of 1968 Toledo Cable procured a new franchise for 10 years with a 10-year renewal option and authority to carry radiobroad-

casts. Although this franchise was adopted after the close of the taxable years in question, it, nonetheless, gives rise to the probability of renewals which could be reasonably anticipated at the close of prior taxable years.

On brief, in their requested findings of fact, the petitioners contend that their applications "occasioned long and difficult" controversies. This request is not supported by the petitioners' offerings of evidence. Although there was a considerable period of time between the initiation of the petitioners' applications in October of 1964 and final passage, in the case of Newport, in March of 1965, it appears that an ordinance was passed to a first reading of January of 1965. In Toledo where negotiations were interrupted and final passage was in May of 1968, the council preliminarily approved a franchise in February of 1965. In addition, due to the nature of the petitioners' proposals it seems fair to say that the delays were of the petitioners' own making. Further, minutes of the City Council meetings in Toledo indicate that meetings were brief. And although Siegenthaler testified that he spent 25 percent of his time on franchise matters his testimony is uncorroborated.

On brief the petitioners contend that the new franchises that were secured were different in a number of material respects from the original franchises and from the franchises they had proposed. Had the petitioners been able to show that the new franchises differed materially from the originals, the showing would have had a dual effect. Firstly, a new franchise not sharing a substantial identity with the old may well be indicative of a new asset, leading to the conclusion that the old had a determinable useful life. Secondly, material differences would have the effect of reinforcing the petitioners' contentions that substantial renegotiations had occurred.

After carefully comparing the terms of the original franchises with the so-called new franchises, it is our conclusion that they do not differ in material respects beyond those proposed by the petitioners; i.e., the increase in franchise fees from 1½ percent (Toledo) and $250 per annum (Newport) to 3 percent of gross local service receipts, increased franchise periods, and provisions concerning radio and advertising. The differences advanced by petitioners, such as a certain degree of municipal control and regulation and the inclusion of standards of service, are merely satellitic to the fact of the continued existence of the franchises. Perhaps the most significant difference was contained in the new Newport franchise which required a substantial rebuilding of the CATV system before the petitioner's option to renew became exercisable. This provision, though concerned with future renewal of the franchise, conditioned said renewal upon a condition within the unilateral control of the petitioner. Furthermore the provision required a course of action which the petitioner had previously decided to

pursue. In sum, we find that there was a substantial identity between the original franchises and the extensions thereof.

The petitioners' contentions that the franchises which were ultimately procured were materially different from those proposed are irrelevant. It would be anomalous for us to consider the petitioners' proposals as a basis for comparison. In making an application for a new franchise the prospective franchisee is unfettered in his choice of terms. When a petitioner proposes a new franchise containing terms different from the original it is inappropriate for him to rely upon subsequent denial of these different terms in order to show that future renewals were not reasonably probable.

Section 221.460, Ore. Rev. Stat. (1953), provides that a municipality may not grant a franchise for a term in excess of 20 years. Petitioners argue that this statute tends to establish determinable useful lives for their franchises. This provision of Oregon law does not aid the petitioners. The statute does not prevent a municipality from granting a new franchise to the same franchisee on terms identical to the old; clearly an extension for purposes of Federal income tax consequences. In the context of the within proceeding Newport Cable upon receiving a new franchise in 1965 for a period of 10 years plus a 10-year renewal will have held, at the end of the period set forth in the franchise, a franchise for over 20 years; i.e., from November 5, 1962, until March 1, 1985.

At trial the petitioners offered evidence concerning attempts to secure franchises in Bend, Oreg., and Astoria, Oreg. This evidence has no probative value here. The negotiations in Bend began in 1968 and cannot be said to be known at the end of any of the taxable periods involved here. Neither has a sufficient connection been established between events transpiring in Bend and Astoria with the events that occured in Toledo or Newport. The actions of one political body cannot be equated to those of another with any degree of assurance.

The petitioners at trial also raised the possibility that outside parties might attempt to obtain CATV franchises in Toledo and Newport. The record does not support this contention. In fact testimony was adduced by the respondent which contradicted the petitioners' contention. Further, this possibility is too speculative to do more than establish mere uncertainty. *Westinghouse Broadcasting Co., supra* at 921. Also in this vein petitioners contend that the rapidly developing technology of the CATV industry may affect future attempts to procure franchise extensions. Although evidence of changing technology was considered in *Birmingham News Co.* v. *Patterson, supra* at 677, we do not find that the petitioners' evidence, by reason of its quantity and quality, does more than indicate some uncertainty.

In sum total, considering the respondent's determination that future renewals or extensions beyond those stated in the pertinent franchises

were reasonably probable, we find that the petitioners have failed to carry their burden of proving that their franchises have determinable useful lives. On the contrary, balancing all relevant facts and circumstances, the respondent's position is well supported. Accordingly,

*Decisions will be entered under Rule 50.*

Reviewed by the Court.

DRENNEN and HOYT, *JJ.*, dissent.