980

V. P. Shufflebarger and Susan Shufflebarger, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 40353. Filed September 9, 1955.

*Harrison Harkins, Esq.,* and *John B. Milliken, Esq.,* for the petitioners.

*George E. Constable, Esq.,* for the respondent.

OPINION.

TURNER, *Judge:* It is the claim of the petitioners that the grazing privileges acquired in 1948 were property used in their trade or busi-

ness within the meaning of section 23 (1) of the Internal Revenue Code of 1939 [5]; that their adjusted basis therefor was $25,821.32, being the amount paid the Wingfields, less $490.68, the amount they regard as being properly allocable as the cost of the fee land; that the period over which the useful life of the property will be exhausted is the term of the permit, which as to them was 8 years, namely, 1948 to 1955, inclusive, and as a consequence that they are entitled to a deduction for 1949 of one-eighth of the above adjusted basis, but in any event, $3,067.65, the amount claimed by them in their return and in their petition herein.

The respondent does not dispute the claim that the grazing privileges were property used by petitioners in their trade or business, but does take the position that the rights acquired were of indefinite duration and not an asset which is exhausted through use or the passage of time, and, such being the case, that the petitioners are not entitled to any deduction therefor under section 23 (1).

The program for the grazing of livestock on the national forests is administered by the Forest Service of the Department of Agriculture, pursuant to and under the provisions of the Forest Service Manual and the regulations of the Secretary of Agriculture relating thereto and the pertinent provisions of the United States Code. Through a study of the manual and the regulations and the provisions of the Code, the controlling purposes and objectives, the rights and obligations of the participants, the powers and duties of the Forest Service in administering the program, and the procedures to be followed take on a definite and understandable form.

That the grazing of livestock on the national forests is to be regarded as a substantial, well-established, and indefinitely continuing part of the national forests program, is not, according to our reading of the grazing regulations and the Forest Service Manual, open to question. In fact, along with the declared purpose of perpetuating the organic resources on both the national forests and related lands, another of the "leading objects" of the said program is the "stabilization of that part of the livestock industry which makes use of the national forests"; and along with and in promotion of such stabilization is the declared purpose of protecting the "established ranch owner and home builder against unfair competition in the use of the range." The word "stabilization" is from the word "stabilize," which means to make stable, and stable, in turn, means firmly established, constant, durable, permanent. Studied in the light of these purposes

---

[5] SEC. 23. DEDUCTIONS FROM GROSS INCOME.
 In computing net income there shall be allowed as deductions:
 * * * * * * *
 (1) DEPRECIATION.—A reasonable allowance for exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
 (1) of property used in the trade or business * * *

and objectives, it seems to us abundantly clear that the statute and the regulations contemplate that once the right to a fair and just allotment of grazing lands has been acquired under the established procedures, that right, subject to some adjustment if it should become necessary for protection of the range or for a more equitable distribution among preference holders, is to be regarded as an indefinitely continuing right.

The program for the use of the national forests for livestock grazing is administered through the establishment, recognition, and utilization of grazing preferences and the issuance of grazing permits. The preferences in and of themselves do not convey or grant the legal right to the use of the range, but they do supply the means whereby the apportionment of the range among the members of the livestock industry making use thereof is effectuated. Of particular significance here, we think, is the fact that it is only to the holders of preferences that the issuance of term or annual grazing permits is authorized, it being provided that the regional forester may authorize the issuance of such permits to "applicants holding established grazing preference and owning commensurate property." Moreover, it is expressly stated that "Preferences in the use of national forest range are approved for the exclusive use and benefit of the persons to whom allowed."

A grazing preference may be acquired in any one of a number of ways, namely, by purchase or inheritance of a permittee's livestock or ranch, or both; by accession as a member of a partnership or a stockholder of a corporation to the pro rata share of such partner or stockholder in a grazing preference and permit held by the partnership or corporation, as the case might be; by "prior use" of land preceding its inclusion in a national forest; by regular use of a forest range under temporary permit for 5 consecutive years; and through restoration of a preference which has theretofore been reduced for range protection.

A preference, once acquired, is not exhausted through use and it is not limited as to time, but is of indefinite duration and continues until canceled or revoked. The grounds for cancellation or revocation are wholly contingent and may never happen, and some are wholly within the control of the preference holder. Cancellation may result where the range is needed for a higher form of use, where it is unsuited to the kind of livestock involved, or where the purchaser of "base" land or livestock fails to meet the local commensurability requirements, or where there has been "a clearly established violation of the terms of the permit, the regulations upon which it is based, or the instructions of forest officers issued thereunder." A preference may be reduced at any time for range protection. It may also be reduced for

violation of the regulations, or for a more equitable distribution of the range. Where the reduction has been for range protection, it is provided that such increased grazing capacity as results from the reduction is to be recognized as belonging to the allotment on which the reduction was made. It is also provided that during the period 1946 to 1955 no reduction for distribution is to be made, except in connection with the transfer of the preference, and then only where the preference at the time of the transfer is above the lower limit and where there is urgent need for admission of new applicants, and if it is feasible to adjust the allotment [6] so as to make the range available to those intended to be benefited. Provision is also made that if it becomes necessary to close an area against grazing, through no fault of the permittee entitled to its use, the loss is not to fall entirely on such permittee but is to be levied against other preferences and spread over the forest or subdivision thereof, so that the permittee in question will bear only his proportionate share of the adjustment.

Briefly stated, the position of the petitioners, if we have read their briefs aright, is that the "record shows affirmatively" that the payments to the Wingfields "were made to acquire grazing rights for the current period only" and for the purposes of section 23 (1), *supra*, that is all they did acquire.

To sustain that position, they rely particularly on the testimony of petitioner V. P. Shufflebarger and on the provisions of the grazing regulations and the Forest Service Manual relating to the expiration and renewal of grazing permits. The testimony of Shufflebarger was that in reaching his decision as to the price he was willing to pay to the Wingfields, he did not consider any period beyond the unexpired term of the current permit, and arguing from the provisions of the grazing regulations and the Forest Service Manual, to the effect that "all grazing permits will automatically expire at the end of a term-period" and that "conditions then obtaining" are to be "thoroughly reviewed" and new permits "issued to an extent compatible with the public interest," the contention is that "within the meaning of the principles announced in the regulations and cases dealing with analogous subjects," there is no right of renewal "which presently and reasonably assures the renewal of the privileges," and, in such circumstances, it follows as a matter of course that, for purposes of section 23 (1), the grazing privileges herein will be exhausted with the running of the term of the current permit. As authority for the proposition stated, the petitioners cite section 29.23 (a)–10 of Regulations

---

[6] Presumably, this qualification is based on the fact that allotments being geographic divisions of the range into natural grazing units, they are not always readily susceptible of any practical reallocation among other preference holders in the particular national forest.

111,[7] *Bonwit Teller & Co.* v. *Commissioner*, 53 F. 2d 381, *Alamo Broadcasting Co.*, 15 T. C. 534, all dealing with leases; *Helvering* v. *Kansas City American Association Baseball Co.*, 75 F. 2d 600, dealing with a contract for personal services; and *Morris Nachman*, 12 T. C. 1204, affd. 191 F. 2d 934, dealing with a liquor license.

Not only are we unable to agree that for the payments to the Wingfields the petitioners acquired "grazing rights for the current period only," but to the contrary, it is in our opinion abundantly clear that the property, rights, or privileges so acquired were of indefinite duration, and, such being the case, are not subject to the allowance for "exhaustion, wear and tear" provided by section 23 (1). By the same token, the lease and personal service contract cases, cited and relied on by the petitioners, are not in point.

The rights in or relating to the grazing of livestock on the national forests have been variously referred to as grazing rights and grazing privileges, and on the facts and under the law and the regulations relating thereto, such grazing rights or privileges represent a composite whole. Making up that whole are the grazing preference, which in the instant case is based or dependent on the ownership of the fee lands, and the various grazing permits, both original and any or all renewals, the issuance of which is in turn dependent upon the holding or owning of the grazing preference.

It is true, of course, that the current permit does by its own terms and under the grazing regulations expire at the end of the 1955 grazing season and will have to be renewed, and if the property, rights, and privileges acquired by the petitioners for the payments made to the Wingfields had been limited to and restricted by the current permit term, the argument advanced would be more understandable. For the payments in question, the petitioners received from the Wingfields the warranty deed to the fee lands, an assignment of the K Bar T Brand, and the waiver of the preference for the grazing of 286 head of cattle on the Coconino National Forest, the said waiver carrying a stipulation by the Wingfields that they would not at any future time apply for a renewal of the said preference. On the basis of such purchase and acquisition of the fee lands and of the "286 head grazing preference," the preference was transferred to and established in the petitioners,

---

[7] SEC. 29.23 (a)–10. RENTALS.—If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run. * * *

In cases in which the lease contains an unexercised option of renewal, the matter of spreading such depreciation or amortization over the term of the original lease, together with the renewal period or periods, depends upon the facts in the particular case. As a general rule, unless the lease has been renewed or the facts show with reasonable certainty that the lease will be renewed, the cost or other basis of the lease or the cost of improvements shall be spread only over the number of years the lease has to run, without taking into account any right of renewal.

and the preference having been so acquired, the Forest Service issued the grazing permit for the unexpired term as a matter of course.

Certainly the life of the fee lands and the K Bar T Brand is not limited by or restricted to the term of the permit, although we do agree with the petitioners that the value and usefulness of the fee lands as such, and separate and apart from the grazing preference, are relatively unimportant, any substantial value they might have had being derived from their relation to the grazing preference, in that they were accepted by the Forest Service as satisfying the "base" or commensurate property requirement for the transfer of the grazing preference. Accordingly, we also agree with the petitioners' view and conclusion that the parties, namely, they and the Wingfields, "quite obviously and logically fixed the consideration paid in terms of the effective waiver of preference."

As already noted, the life of a grazing preference is not delimited by the term of the current grazing permit, but is of indefinite duration and continues until canceled or revoked. It may be adjusted up or down for the protection or a more equitable distribution of the range, and there are contingencies the occurrence of which could cause its termination, but those contingencies are not geared to any term period or the passage of time, and they may never happen. Furthermore, the parties are in agreement that there is no exhaustion from wear and tear through use. It is of course true, as stated above, that a preference does not of itself convey a legal right to the use of the national forest range, but it does supply the means whereby and through which the apportionment of the range among the members of the livestock industry making use thereof is effectuated. Moreover, it is only to holders of "established grazing preference" that the Forest Service is authorized to issue term or annual permits and renewals thereof. In other words, the holding of a grazing preference is the *sine qua non* of the grazing permit, whether it be an original issuance or a renewal, and in that connection, it is significant, we think, that though provision is made in the grazing regulations and the Forest Service Manual for the "sales and transfers" of preferences, there is no comparable provision relating to or providing for the sale or transfer of grazing permits thereunder. The reason, we think, is clear, and is that the preference is the dominant element of the grazing privileges, and in the absence of contingencies, which may never happen, the grazing permit, as the facts show was true in this case, and renewals thereof follow the preference as a matter of course.

The petitioners, in making their argument, appear to have proceeded on the premise that, unless a later or extended life is assured by the terms and wording of the current permit itself, it must follow as a matter of law, under the regulations and cases cited above, that

for the purposes of section 23 (1) the useful life of the grazing privileges is limited to the term of the grazing permit. That reasoning does appear to have been dispositive of the lease and personal service contract cases cited and relied on, since in those cases the rights of the parties were evidenced in toto by the lease or contract, and there was present no right which resembled or was in any way comparable to the grazing preference, which, as we have already indicated, is an important and dominant element of that composite whole, namely, the grazing rights or privileges which the petitioners acquired and which are here in issue.

In so restricting and limiting their argument to the terms and provisions of the grazing permit, the petitioners have failed to show or demonstrate just how or on what basis the provisions of section 23 (1) are to be applied to the grazing preference. The nearest approach to a consideration of the problem we have been able to find, is a summary reference in their reply brief, to the effect that since at the end of the permit term the "conditions then obtaining" are to be "thoroughly reviewed, and new permits issued to an extent compatible with the public interest," and since conditions which will then obtain were "unknown and unknowable in 1949, the year at issue," there is no ground for a factual finding that they, the petitioners, "are reasonably certain of a renewal of their permit or *a continuation of their preference beyond 1955*." (Emphasis supplied.)

As to the grazing preference, the petitioners, we think, are ignoring or mistaking the law, their burden of proof, and the facts of record. Generally, it is to be noted that the allowance for exhaustion under section 23 (1) is to be confined to property of a nature which when or as used in the taxpayer's business "gradually approaches a point where its usefulness is exhausted," and further, the exhaustion allowance is to be limited and restricted to "the cost or other basis of the property in respect of which the allowance is made." Secs. 29.23 (1)–2 and 29.23 (1)–4 of Regs. 111. With respect to intangibles, the applicability of section 23 (1) is specifically covered by section 29.23 (1)–3 of the said regulations, and it is therein provided that intangibles used in the trade or business, or in the production of income, may be the subject of a depreciation allowance, provided such use in the trade or business or in the production of income "is definitely limited in duration," but if not so limited, "will not usually be a proper subject of such an allowance. If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible may be the subject of a depreciation allowance, provided the facts are fully shown in the return or prior thereto

to the satisfaction of the Commissioner." Accordingly, in the case of an intangible which, as in the case of the grazing preference, not only is not "definitely limited in duration," but as to its useful life is limited only by contingencies, which may never happen, the fact that the conditions which will obtain at the end of the current permit term "were unknown and unknowable in 1949, the year at issue," refutes, rather than supports, the conclusion contended for. The question is not whether the evidence will support a factual finding that the life of the preference will continue beyond 1955, but whether the evidence will support a factual finding that "from experience" it is reasonably certain that the grazing preference will be of value "only" for the period of the current permit term.

Actually, the petitioners have made no apparent effort to make the showing required of them under section 29.23 (1)-3, *supra*, but, calling attention to the fact that the current permit expires at the end of its specified term and will have to be renewed, argue that section 23 (1) applies to the payments made to the Wingfields. There is no showing that "from experience" it is "known" that the grazing preference, or, to use the comprehensive term, the grazing privileges, will be of value in their business or in the production of income for only a limited period, or that the length thereof can "from experience" and "with reasonable certainty" be estimated to be the current permit term, or any other limited period.

It is not necessary here, however, to rest our decision on a failure of proof on the part of the petitioners, since as we view the evidence the grazing rights and privileges will "with reasonable certainty" be of value in their business as long as they desire them to be. It would, we think, come as a distinct and severe shock to the holders of established grazing preferences—even including the petitioners themselves—if with any color of authority they should be told that their grazing preferences carried no reasonable certainty that their grazing rights or privileges thereunder would not continue beyond the current permit term. The petitioner himself admitted, on cross-examination, that it was his understanding that permits are customarily renewed at the end of the permit period, and the grazing regulations and the Forest Service Manual indicate a long history of grazing on the national forests under the authority of the Forest Service permits. In fact, the Forest Service Manual shows that even today the grants of privilege for the grazing of livestock upon the national forests are made under the Act of June 4, 1897. It is obvious, we think, that a grazing right or privilege which on the basis of experience and with reasonable certainty would expire at the end of a grazing permit term, more specifically the current permit term, would be inimical to and not in promotion of such expressly declared "leading objects" of the

range management program as the "stabilization of that part of the livestock industry which makes use of the national forests" and the protection of "the established ranch owner and home builder against unfair competition in the use of the range." To say the least, there would be little inducement to become a home builder or the owner of an "established" ranch, as, for instance, the Bar D, the Lost Eden, or the Apache Maid, if the permanency thereof should be dependent upon a grazing program no more certain in duration than that portrayed by the petitioners for the purposes of this case.

Furthermore, we think that the grazing permit itself is in harmony with and not in refutation of the conclusion that the life of the grazing privileges is not limited to the term of the current permit. Aside from the recitation of matters which are specified by and derived from the established grazing preference, such as the kind and number of livestock, the grazing season of the year for which the preference has been established, and the national forest to which the grazing privileges relate, the grazing permit in practical effect serves as a means for prescribing the details incident to the day-to-day and season-to-season grazing of livestock on the allotment involved during the permit term, such as the requirements relating to the annual grazing fees and the payment thereof, the observance of range management plans, or other instructions, and the duties of the permit holder as to fire prevention. In short, the permits supply the details whereunder and whereby the grazing program is currently administered and the purposes underlying the establishment of the indefinite grazing privileges are carried out. Moreover, we do not regard the requirement that at the end of the permit term "the conditions then obtaining" are to be thoroughly reviewed, and new permits "issued to an extent compatible with the public interest" as being persuasive or indicative of a conclusion that there is a likelihood, to say nothing of a reasonable certainty, that the life of the grazing privileges will expire with the term of the permit or actually be affected thereby. Under the grazing regulations, the conditions existing are subject to review not only at the end of the permit term, but during and at the end of each year, and, so far as we have been able to find or have been shown, there is little, if any, difference in substance between the actual review of existing conditions with respect to the grazing preference and that which is to be made at the end of the permit term. As to the dependency for permit renewal on compatibility "with the public interest," it would appear that in light of the above-declared "leading objects" of the grazing program, such as the stabilization of the livestock industry and the protection of the established ranch owner and the home builder, the public interest would be served by the renewal of grazing permits, rather than

otherwise. In the circumstances, we are satisfied that the term permit does not and was not intended to delimit the life of established grazing privileges as we are concerned with them here.

Another indication that a dominant purpose and intent of the national forest grazing program is the protection of preference and permit holders in their grazing rights and privileges against possible contingencies is to be found in the provision of the Forest Service Manual to the effect that if it should become necessary to close an area against the grazing of livestock but through no fault of the permittee who has had the use of it, the loss is not to fall entirely upon such permittee, but sufficient reduction may be levied against other preferences and spread over the forest or subdivision thereof so that the said permittee will bear only his proportionate share of the adjustment. It would thus appear that unless the whole forest or the subdivision encompassing the Blind Lake Allotment should be closed to grazing at the end of the original permit term, the petitioner could, at the most, suffer a reduction of his grazing preference and of his permit, if required for protection or a more equitable distribution of the range, and not a termination thereof.

On the facts, and under the law and the regulations which govern the grazing of livestock on the national forests, it is our conclusion and we hold that the rights, property, and privileges acquired by the petitioners in return for the payments made to the Wingfields are not limited as to time but, subject only to contingencies, which may never happen, could continue forever, and the payments made to the Wingfields in their acquisition are not subject to the exhaustion allowance provided under section 23 (1). See and compare *Morris Nachman*, *supra*. Compare also *Mid-State Products Co.*, 21 T. C. 696, 714, and *X-Pando Corporation*, 7 T. C. 48.

Whether or not the petitioner "ignored the possibility of renewals in computing the consideration" he was willing to pay the Wingfields, or whether he has or has not made up his mind to apply for a renewal of the term permit, are, in the circumstances, of no controlling importance. The price he was willing to pay was as to him a subjective matter, and the limitations with respect thereto which he may have placed upon himself could in no way restrict or confine the life of the rights acquired to a limited term, where the facts were otherwise, and even if he should decide not to continue in his present venture and not to apply for renewal of his permit, he would still have the privilege of selling or disposing of his unwanted fee lands and grazing preference, as was the case with the Wingfields. His recovery or loss of his investment would be the result of and would occur in the year of such sale or other disposition of the property, which, taxwise, would be governed by the gain or loss provisions of the Code, not section

23 (1). And in the event a sale, exchange, or other disposition of the property should fail to materialize and abandonment should be decided upon, the loss of his cost due to such abandonment would likewise occur in the year of abandonment, which could not be the year herein.

*Decision will be entered under Rule 50.*