Norman **SHUTLER** and Virginia Shutler, Plaintiffs-Appellees,

v.

**UNITED STATES of America,** Defendant-Appellant.

A. H. **TURNER** and Edith Turner, Plaintiffs-Appellees,

v.

**UNITED STATES of America,** Defendant-Appellant.

No. 71-1496.

United States Court of Appeals, Tenth Circuit.

Dec. 29, 1972.

Rehearing Denied Jan. 22, 1973.

---

**1144**

Thomas E. Baker, Hennessey, Okl., for plaintiffs-appellees.

Leonard J. Henzke, Atty., Tax Div., Dept. of Justice (Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks, Bennet N. Hollander and Jane M. Edmisten, Attys., Tax Div., Dept. of Justice, and William R. Burkett, U. S. Atty., on the brief), for defendant-appellant.

Before LEWIS, Chief Judge, and HOLLOWAY and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge. (Reassigned for opinion to McWilliams, Circuit Judge, from Holloway, Circuit Judge, on November 16, 1972.)

Norman and Virginia Shutler brought an action in the District Court for the Western District of Oklahoma for refund of income taxes paid for the year 1966. A. H. and Edith Turner at the same time filed a separate proceeding in that same court which also sought a refund of income taxes paid for that same year. These two proceedings were consolidated for purposes of discovery and trial by appropriate order of the trial court and these consolidated cases were then later submitted to the trial court on a comprehensive stipulation agreed to by the parties. Based on the stipulation the trial court made certain findings and entered judgment against the United States for the Shutlers in the amount of $5,180.50, plus interest, and in favor of the Turners in the amount of $1,046.-45, plus interest. The United States now appeals.

As indicated, the essential facts are agreed to by the parties. Virginia Shutler and Edith Turner are parties to the proceeding simply because they filed joint income tax returns for the tax year 1966 with their respective spouses. Norman Shutler and A. H. Turner, hereinafter referred to as the taxpayers, are described in the stipulation as "co-tenants in farming operations in Kingfisher County, Oklahoma," and as such they jointly owned or leased various tracts of land used in their farming operation.

The particular tract of land which precipitates this controversy is the northeast quarter of section 36, township 17 north, range 6 west, Kingfisher County, Oklahoma. On April 29, 1966, the taxpayers were high bidders for and purchased the northwest quarter of that section from the Adele Nieman estate. For a number of years prior to 1966 Adele Nieman had been the lessee of the northeast quarter of section 36 under a so-called Preference Right Lease with the State of Oklahoma. This lease covered land owned by the State of Oklahoma and supervised by the Commissioners of the Land Office for that

state. On April 29, 1966, the taxpayers also purchased at auction from the Nieman estate the Preference Right Lease to the aforesaid northeast quarter of the section with which we are here concerned. The taxpayers paid a total sum of $15,000 for the lease in question, $13,000 of which was allocated to the cost of acquisition and $2,000 to the value of the improvements thereon. Under the lease the annual rental paid the State for the property was $850.

Pursuant to the requirements of the Land Office of the State of Oklahoma, the Nieman estate executed a relinquishment in favor of the taxpayers. The latter then made formal application for the lease and eventually obtained a lease for the period of time from August 23, 1966, to and including December 31, 1966, from the State. Such period of time incidentally was the balance of time remaining on the five-year lease held by Adele Nieman at the date of her death. Thereafter, the taxpayers obtained a renewal of the lease from the State for a five-year period, i. e., from January 1, 1967, to and including December 31, 1971, at an annual rental of $850. The critical issue in the case relates to the nature of the $13,000 expenditure incurred by the taxpayers in acquiring the lease from the Nieman estate, which in turn concerns the nature of the so-called Preference Right Lease thus acquired by the taxpayers. A bit of background will perhaps place the matter in focus.

The State of Oklahoma, through the Commissioners of the State Land Office, is entrusted with the leasing and sale of school lands. Such land is owned by the State and the income therefrom is designated for specific purposes. Although some acreage in the past has been sold outright, today practically none is sold, but is leased. Thus the Land Office enters into approximately 3,500 agricultural and grazing leases on these school lands, all for a term of five years, all of which come due on the same date. Approximately half of these leases are so-called Preference Right Leases, under which the State grants the lessee the preferential right to purchase the land he is leasing from the State for an amount equal to the highest bid at an auction sale, if and when the State ever decides to sell.

Prior to 1946, all Preference Right Leases also contained a provision that the lessee had the right to re-lease the land upon the expiration of the lease then in force. This provision was dropped in 1946. However, ever since that date it has been, and is, the policy of the Land Office to re-lease the school lands at the end of the five-year period to, and only to, the person in possession at the expiration of the lease, except for cause, such as, for example, nonpayment of rent, abuse of the land, and the like.

As for the transferring of a Preference Right Lease, the Land Office has the lessee execute a relinquishment in favor of the proposed new lessee. Then following an investigation of the proposed lessee, a new lease is entered into for the remaining portion of the five-year term of the original lease.

In this general setting, the taxpayers filed their 1966 tax returns with each claiming that he was entitled to deduct from his gross income his proportionate share of the cost of acquiring the Preference Right Lease on the aforesaid northeast quarter of section 36. The Internal Revenue Service disallowed this deduction, with the taxpayers paying the full tax and then suing for a refund. As above stated, the trial court ruled in favor of the taxpayers and the Government appeals.

The findings of the trial court are rather meager and give little insight into its reasoning. However, there was the obvious finding that the taxpayers acquired a lease on certain lands in the State of Oklahoma and paid therefor $13,000, which sum was paid during the year 1966 for a lease which expired December 31, 1966. In connection therewith the trial court then went on to make what it obviously believed to be a critical finding to the effect that the lease thus acquired "contained no option,

and there was no reasonable certainty that the Commissioners of the Land Office would renew said lease for any given period of time." In this latter regard, the trial court opined that such leases are subject to the "whims of the Oklahoma Legislature, which meets every year and which has over the years enacted and repealed various laws dealing with the administration of State Lands."

In our view, the trial court's finding that there was no "reasonable certainty" that the Land Office would renew the lease thus acquired by the taxpayers for any period of time is contrary to the stipulation. While it is true that the Preference Right Lease did not itself grant the lessee a preferential right to re-lease at the end of a leasehold period, the fact remains that from the record one can only conclude that it was the unvarying practice to so do. Some proof of this practice, though of course not controlling, is the fact that the taxpayers did in fact obtain a renewal of the lease which they acquired from the Nieman estate.

Concerning the practice of renewing the lease to the party holding it when the lease period expires, the deposition of N. A. Gibson, Chief Counsel for the Commissioners of the Land Office of the State of Oklahoma, was before the trial court as a part of the stipulation, and his declaration, which stands unrefuted, was as follows:

"Since my association with the department in 1952, it has been the consistent policy of the Commissioner, at the expiration of the term of the lease, to offer a new lease for the ensuing term to the lessee, whether he be a preference right lessee or a non-preference right, lessee, assuming that he has paid his rent, and he has taken proper care of the land."

This policy incidentally was in accord with the Rules and Regulations of the Land Office. Section 4.205 of those regulations provides as follows:

"Except when specifically ordered by the Commissioners leases will not be offered for bid. Generally, only the owners and holders of expiring leases as reflected by the records of the Commissioners will be entitled to receive new lease forms for execution."

And to the same effect is Section 4.-206, which reads:

"If the holder of an expiring lease, his administrator, executor, heirs and/or devisees do not desire a new lease at the expiration of an existing lease, or a lease has been forfeited or canceled, the Commissioner may order the sale of such lease to the highest and best bidder * * *."

Accordingly, we conclude that the trial court's finding that there was no reasonable certainty that the Land Board would renew the taxpayers' lease when it expired on December 31, 1966, is clearly erroneous. Indeed, in our view the record shows the exact opposite. And the fact that the taxpayers as the holders of the lease when it expired on December 31, 1966, were with reasonable certainty assured of a renewal of their lease is of much legal significance in the resolution of this controversy. In this regard the rule is quite clear that in determining the character of any transaction or arrangement for taxpayers, it is the substance, rather than the form, that controls and that under this principle the terms of a lease may even be disregarded. Highland Hills Swimming Club, Inc. v. Wiseman, 272 F.2d 176 (10th Cir. 1959). See also Babcock v. Phillips, 372 F.2d 240 (10th Cir. 1967).

The taxpayers' basic position, which apparently was adopted by the trial court, is that "since the cost of acquiring the lease in question expired in the year in which it was obtained, the entire cost was deductible that year." In thus arguing, counsel stresses the fact that the taxpayers had no contractual right to renew the lease upon its expiration. As indicated, such in our view ignores the fact that it was nonetheless the practice to renew, which of course explains why the taxpayers were willing to pay the estate of Adele Nieman the sum

of $13,000 for a lease which had approximately four months to run and called for an annual rental of only $850. In other words, it is inconceivable that the taxpayers would pay the sum of $13,000 for a lease which had only four months to run, and the $13,000 obviously represented the value of the renewal privilege which by custom attached to the lease.

It is the Government's position that the cost of acquisition of the lease was not an ordinary and necessary business expense, but a capital expenditure. It is the further position of the Government that because of its nature the $13,000 expenditure does not qualify for depreciation. In this latter regard, it is claimed that depreciation of an intangible asset is only allowed when the asset in question is limited in its useful life and its partial exhaustion can be computed with reasonable accuracy, citing Shufflebarger v. Commissioner, 24 T.C. 980 (1955). Treas.Reg. § 1.167(a)–3. We generally agree with the Government's position.

■ It is well established that the statute authorizing a deduction from gross income of all ordinary and necessary business expense does not authorize a deduction for capital expenditures. Welch v. Helvering, 290 U.S. 111, 54 S. Ct. 8, 78 L.Ed. 212 (1933). In distinguishing the two, in United States v. Akin, 248 F.2d 742 (10th Cir. 1957), cert. denied, 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532 (1957), appears the following pertinent comment:

"* * * It is not always easy to find a verbal formula which readily supplies an unerring guide in drawing the boundary line between current expenses and capital outlays. But it may be said in general terms that an expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year * * *."

An analogous case quite helpful in resolving the present controversy is Nachman v. Commissioner of Internal Revenue, 191 F.2d 934 (5th Cir. 1951). We subscribe to its rationale and accordingly will refer to it at length.

In *Nachman,* the taxpayer purchased an existing municipal retail liquor license for the sum of $8,000. The license in question was an annual one issued by the municipality for a fee of $750, and when purchased by the taxpayer had some five months to run before it expired. The licenses were assignable and carried with them valuable renewal privileges, "as it was the established practice in issuing renewal licenses from year to year to prefer the holders of existing licenses over other applicants." The taxpayer then sought to deduct from his gross income as an ordinary and necessary business expense the entire $8,000 paid for the license. The Tax Court held that the taxpayer was entitled to deduct as an ordinary business expense the $750 license fee, but was not entitled to deduct the balance of the sum paid for the license, namely $7,250. In upholding this determination by the Tax Court the following comment was made which is repeated here because of its peculiar applicability to the present controversy:

"Of course it was necessary for petitioners to have a license before they could commence business. None could be procured directly from the City, as the maximum number allowed by law had already been issued. Like other scarce commodities, they commanded a premium on a seller's market. The license carried with it by established custom, if not by law, a valuable renewal privilege indispensable to petitioners' continuance in business in subsequent years. In purchasing the license, petitioners bought not only the operating right for the current year but also renewal privileges for future years. This privilege, entitling petitioners to preference over non-license holders in the issuance of renewal licenses, was of substantial val-

ue, of which the seller and the purchasers of this license were well aware. No one would pay $8,000 for a $750 license having only five months to run, unless the purchaser was reasonably sure it carried with it appurtenant privileges of substantial future value to the purchaser. It was these considerations that prompted petitioners to pay $8,000 for a $750 license, of which only 5/12ths remained.

"Of the $8,000 paid for the license in question, the official cost of issuance, $750, was an ordinary and necessary business expense. The remaining $7,250 was the expenditure of capital in the acquisition of a capital asset reasonably expected to serve petitioners through future years, the cost of which is not deductible as an ordinary expense. * * *.

"Petitioners further contend that if the $7,250 in question be regarded as the purchase price of a capital asset and therefore not deductible as ordinary business expense, they are entitled to an amortized depreciation allowance on such capital asset under 26 U.S.C.A. § 23, and Treasury Regulation No. 111, sec. 29.23(1)–3, relating to depreciation of intangible property. Depreciation allowance on intangibles, however, is confined to those definitely limited in duration, such as patents, franchises, copyrights, licenses for fixed periods, and the like, the partial exhaustion of which may be computed with reasonable certainty.

"It is clear that the renewal privilege appurtenant to this license extends beyond, and was actually exercised beyond, the taxable year in question. Presumably the petitioners may continue to exercise their renewal privileges as long as they desire, as there is no indication that the City will depart from its custom of renewing existing licenses. How long petitioners may wish to continue exercising their renewal privileges is indeter-

minable. It might be for one year, or many. It was exercised by them at least as late as 1949. The basis for depreciation of an intangible capital asset is partial exhaustion due to lapse of time. This renewal privilege being of indefinite duration, dependent upon petitioners' wishes as well as upon the City's future course of action, there is no rational basis for prediction as to duration.

"Moreover, if petitioners elect to discontinue the exercise of their renewal rights, it is reasonable to assume that they will sell them, just as did their predecessor Bryan, either recouping their investment or sustaining a deductible loss. We conclude therefore, as did the Tax Court, that the renewal privilege incident to the license is a nondepreciable capital asset. * * *.'"

To like effect, see such cases as Richmond Television Corp. v. United States, 354 F.2d 410 (4th Cir. 1965); Commissioner v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 645, 15 L. Ed.2d 539 (1966); and KWTX Broadcasting Co. v. Commissioner, 272 F.2d 406 (5th Cir. 1959), 31 T.C. 952 (1959), aff'd per curiam, involving the acquisition of television and radio licenses.

■ It is for these reasons that we hold that the trial court erred first in its finding that there was no reasonable certainty that the Land Office would renew the lease which the taxpayers had acquired from the Nieman estate and then erred further in concluding that the $13,000 paid for the lease was deductible from taxpayers' gross income as an ordinary and necessary rental expense incurred in taxpayers' farm operations for the 1966 tax year.

Judgment reversed and the case is remanded with directions that the trial court enter judgments in favor of the Government.