KERMIT AND BETTY UECKER, ET AL.,[1] PETITIONERS .V. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 16419-79—16421-79, 16435-79.     Filed December 19, 1983.

---

[1]Cases of the following petitioners were consolidated herewith for trial, briefing, and opinion: Kermit W. Uecker, docket No. 16420-79; Ann Uecker (now Ann Richardson), docket No. 16421-79; Jon and Sheridan Hansen, docket No. 16435-79.

*Towner Leeper* and *David Leeper*, for the petitioners.
*James N. Mullen* and *John R. Eiman*, for the respondent.

GOFFE, *Judge*: The Commissioner determined deficiencies in the petitioners' Federal income tax for the taxable years as follows:

| Petitioners | Docket No. | Taxable year | Amounts |
|---|---|---|---|
| Kermit and Betty Uecker | 16419–79 | 1976 | $5,415.26 |
| Kermit W. Uecker | 16420–79 | 1972 | 4,773.92 |
| | | 1973 | 7,142.41 |
| | | 1974 | 1,090.50 |
| | | 1975 | 6,089.59 |
| Ann Uecker | 16421–79 | 1972 | 4,773.92 |
| | | 1973 | 7,142.41 |
| | | 1974 | 1,090.50 |
| | | 1975 | 6,089.59 |
| Jon and Sheridan Hansen | 16435–79 | 1975 | 29,650.00 |
| | | 1976 | 21,877.00 |

After multiple concessions by the parties, the issues for decision are the respective values and useful lives of various components of a ranch (including attendant grazing privileges) and whether any such components qualify for investment credit pursuant to section 38.[2]

---

[2] All section references are to the Internal Revenue Code of 1954 as amended.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and accompanying exhibits are so found and incorporated herein by reference.

Petitioners Kermit and Ann Uecker (now Ann Richardson) were married at all times during taxable years 1972, 1973, 1974, and 1975, filing joint Federal income tax returns for such years with the Internal Revenue Service in Austin, Tex. In 1976, Kermit and Ann Uecker were divorced. Kermit Uecker subsequently remarried and filed a joint Federal income tax return with Betty Uecker for the taxable year 1976 with the Internal Revenue Service in Austin, Tex. Petitioners Jon and Sheridan Hansen were married at all times during 1975 and 1976 and filed joint Federal income tax returns for such years with the Internal Revenue Service in Austin, Tex. All of the petitioners resided in El Paso, Tex., when they filed their petitions.

On April 1, 1975, petitioners Jon and Sheridan Hansen and Kermit and Ann Uecker purchased a ranch in New Mexico (hereinafter referred to as the Mt. Riley Ranch) from Gerald and Barbara Strauss for $313,000. Petitioners paid for said ranch by assuming an underlying mortgage with an outstanding principal balance of $213,000 and executing a $100,000 promissory note payable over a 7-year term. On April 1, 1975, petitioners also agreed to lease back the Mt. Riley Ranch to the Strausses for a 7-year period at an annual rent of $17,914 which also equaled petitioners' payment obligations with respect to the $100,000 promissory note.

For the consideration paid, petitioners received: (1) A fee simple interest in 159.396 acres of land (hereinafter referred to as the patented land) and improvements thereon; and (2) attendant grazing privileges with respect to (a) 75,360 acres of contiguous land owned by the United States and administered by the Department of Interior's Bureau of Land Management (hereinafter referred to as BLM), and (b) 6,540.76 acres of adjacent land owned by the State of New Mexico. Physical improvements at the Mt. Riley Ranch were primarily located on the patented land and included: (1) A main dwelling; (2) miscellaneous ranching structures consisting of a barn, a garage, and several storerooms; (3) 40 miles of interior fences and a one-half interest in 16.75 miles of exterior fences; (4)

several corrals; (5) assorted wells, pumps, pipelines, and a storage tank; (6) several earthen dams and unimproved roads; and (7) miscellaneous equipment. Much of the fencing was at least 20 years old when petitioners purchased the facility. Petitioners' purchase agreement with the Strausses made no allocations concerning the values of any ranch assets.

The parties have agreed that no portion of the ranch's purchase price is allocable to the various unimproved roads or miscellaneous equipment at the Mt. Riley Ranch. The parties have also agreed to allocate portions of the purchase price among several ranch components as follows:

| Item | Amount |
| --- | --- |
| (1) Corrals .................................................... | $8,000 |
| (2) Wells, pumps, pipelines, and storage tank ....... | 6,570 |
| (3) Earthen dams ........................................... | 8,000 |
| (4) 159.396 acres of patented land ..................... | 4,800 |
| (5) State grazing privileges ............................... | 34,335 |

Given the relatively small size of petitioners' patented land at the ranch, the attendant grazing privileges on both the Federal and State-owned lands are extremely valuable and an essential component of any successful large-scale ranching operation. The tracts comprising such Federal and State grazing areas are intermingled and not separated by physical barriers. There are no differences among them as to their forage producing ability, carrying capacity, or general utility in the ranching industry. Environmental conditions at the Mt. Riley Ranch are generally quite arid although palatable range grasses including tobosa, sacaton, bear grass, curly mesquite, and 6-week grama grass naturally grow in semibare areas during periods of high soil moisture.

Grazing privileges on the federally owned lands are generally governed by the Taylor Grazing Act of 1934 (hereinafter sometimes referred to as the act).[3] Section 1 of the act authorizes the Secretary of the Interior to establish grazing districts on various Federal lands and to issue grazing permits to certain qualified persons.[4] Section 3 of the act[5] establishes a

[3]43 U.S.C. sec. 315 et seq. (1964).
[4]43 U.S.C. sec. 315 (1964).
[5]43 U.S.C. sec. 315b (1964).

system of priorities concerning the granting of such grazing privileges and defines the nature of the interest acquired as follows:

Preference shall be given in the issuance of grazing permits to those within or near a district who are landowners engaged in the livestock business, bona fide occupants or settlers, or owners of water or water rights * * * Such permits shall be for a period of not more than ten years, subject to the preference right of the permittees to renewal in the discretion of the Secretary of the Interior, who shall specify from time to time numbers of stock and seasons of use * * * but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this chapter shall not create any right, title, interest, or estate in or to the lands.

Although the act only addresses the Department of Interior's regulation of grazing privileges through the issuance of permits, no multiyear permit is needed to secure the required BLM grazing license. Specific seasonal use of such lands is actually regulated through annual licensing procedures which also determine the number of animal-unit months (AUMs)[6] a tract can support and the attendant grazing fees. Licensees without multiyear permits are still entitled to application and renewal preferences. Finally, as a practical matter in accordance with all statutes, regulations, and customary procedures, once Federal grazing privileges are obtained pursuant to a preference, the landholder's ability to secure additional renewals thereof generally continues indefinitely although subject to possible changes in the AUM levels due to varying range conditions.

Grazing privileges on the land owned by the State of New Mexico have slightly different attributes. Lands designated for grazing can be leased for terms of up to 5 years with no additional annual licensing requirement.[7] A major similarity, however, to the related Federal grazing system concerns the preferential treatment accorded some leasehold applicants. Under New Mexico law, prior lessees of a particular tract have a preferred right of renewal;[8] hence, once leasehold rights to a

---

[6]An animal-unit month (AUM), as applied to Federal range grazing privileges, is the ability to graze one cow or its equivalent for a period of 1 month. 43 C.F.R. sec. 4110.0–5(o) (1974). Thus, a cow grazing for an entire calendar year requires 12 AUMs.

[7]N.M. Stat. Ann. sec. 7–8–31 (1953).

[8]N.M. Stat. Ann. sec. 7–8–51 (1953).

given tract are obtained, the user's ability to secure additional renewals thereof generally continues indefinitely. Finally, the State of New Mexico can regulate the degree of use of such leased lands by imposing AUM limits during the term of the lease.

Upon petitioners' purchase of the Mt. Riley Ranch, the Strausses transferred to them all interests in and rights to the grazing privileges on both the Federal and State-owned lands. Such grazing privileges included a 1-year BLM grazing license for the period March 1, 1975, to February 29, 1976, with respect to 75,360 acres of land in the Las Cruces grazing district and a 5-year lease of 6,540.76 acres of State of New Mexico lands which commenced October 1, 1974. The BLM grazing license contained an annual 5,448 AUM limit, while the record is silent concerning similar State restrictions.

Petitioners allocated the $313,000 Mt. Riley Ranch purchase price among its components and claimed straight-line depreciation deductions for the taxable year 1975 as follows:

| Item | Amount | Useful life (in years) | Depreciation[9] for 1975 |
|---|---|---|---|
| (1) Fences | $130,000 | 7 | $6,964 |
| (2) Dams, windmills and pipeline | 45,334 | 7 | 2,429 |
| (3) Corrals, barn, and storehouse | 37,000 | 7 | 1,982 |
| (4) Ranchhouse | 26,000 | 15 | 650 |
| (5) Miscellaneous | 7,396 | 7 | 396 |
| (6) Wells and pumps | 6,570 | 10 | 352 |
| (7) Roads, bridges, and culverts | 2,700 | 7 | 145 |
| | 255,000 | | 12,918 |

Petitioners allocated an additional $40,000 of the purchase price to existing forage on the ranch (including areas subject to Federal and State grazing privileges), and each couple expensed $20,000 for the 1975 taxable year as "feed purchased." The remaining balance of the purchase price ($18,000) was apparently allocated to nondepreciable assets. Petitioners Kermit and Ann Uecker and Jon and Sheridan Hansen also claimed $10,000 of investment credit on each of their 1975

[9]Both Kermit and Ann Uecker and Jon and Sheridan Hansen claimed depreciation deductions on their joint Federal income tax returns in such amounts pursuant to their respective 50-percent ownership interests in the Mt. Riley Ranch.

joint Federal income tax returns with respect to the assets at the Mt. Riley Ranch.

For the taxable year 1976 (which was the first full year of petitioners' operation of the Mt. Riley Ranch), petitioners continued their straight-line depreciation of the above-referenced components. Petitioners Jon and Sheridan Hansen claimed deductions totaling $17,084 with respect to such depreciable assets, while petitioners Kermit and Betty Uecker claimed a total of $17,224 of deductions for the same assets. The Commissioner disallowed all of petitioners' claimed depreciation deductions for lack of substantiation; disallowed the claimed feed-expense deductions for failure to establish it was expended for the purpose shown on the return; and disallowed the claimed investment credit on the basis that the property did not qualify.

### ULTIMATE FINDINGS OF FACT

The allocable portions of the Mt. Riley Ranch purchase price with respect to its main dwelling, miscellaneous ranching structures, fencing, and Federal grazing privileges are $12,000, $2,000, $48,375, and $188,920, respectively. No portion of the purchase price is attributable to forage. The Federal and State grazing privileges have indefinite useful lives.

### OPINION

### I. ALLOCATION OF PURCHASE PRICE

The primary issue for decision concerns the allocation of the purchase price of the Mt. Riley Ranch among its various components. As set forth in the findings of fact, the parties have agreed that $61,705 of the $313,000 purchase price be allocated among several ranch assets. No agreement was reached with respect to apportioning the balance of the purchase price among the remaining resources which consist of the main dwelling, miscellaneous ranching structures, 56.75 miles of interior and exterior fences, existing forage on the patented and grazing lands, and Federal grazing privileges on 75,360 acres of lands licensed by BLM.

## A. *Main Dwelling and Miscellaneous Ranching Structures*

The first allocation issue involves that portion of the Mt. Riley Ranch purchase price representing the main dwelling and miscellaneous ranching structures consisting of a barn, a garage, and several storerooms. Petitioners and respondent each presented one expert witness who valued such improvements by multiplying their square footage by selected reproduction cost figures and then discounting the products for accrued depreciation. Petitioners' expert witness valued the main dwelling and miscellaneous ranching structures at $22,140 and $1,220.80, respectively. Respondent's expert witness valued such improvements at $12,000 and $2,000, respectively. Petitioners' expert witness, however, was unable to substantiate the replacement costs per square foot utilized in his computations. After considering the appraisal reports and testimony of the expert witnesses, we conclude that the petitioners have failed to carry the burden of proof placed upon them by Rule 142(a).[10] Accordingly, we find that the allocable portions of the purchase price with respect to the main dwelling and miscellaneous ranching structures are $12,000 and $2,000, respectively.

## B. *Fences*

The next disputed allocation concerns 40 miles of interior fences and a one-half interest in 16.75 miles of exterior fences. Although petitioners initially allocated $130,000 of the Mt. Riley Ranch purchase price to such structures on their tax returns for depreciation purposes, the parties have subsequently agreed that the reproduction costs of such fences would have been approximately $85,000 in 1975. The parties, however, disagree as to the amounts of adjustment necessary for accrued depreciation, which petitioners and respondent contend are 15 percent and 40 percent, respectively. Petitioners' expert witness prepared his valuation by review of BLM records and discussions with BLM personnel and local ranchers, and his appraisal specifically assumes constant maintenance of such structures. The valuation prepared by respondent's expert witness is also partially based upon review of BLM records, yet respondent's expert also personally inspect-

---

[10] All references to Rules are to the Tax Court Rules of Practice and Procedure.

ed portions of the structures in issue. BLM records concerning improvements on the Mt. Riley Ranch indicate that much of the fencing was over 20 years old when petitioners purchased the ranch. Further, no evidence was presented concerning the constant maintenance of such structures since their construction. Therefore, after considering the appraisal reports and the testimony of the expert witnesses, we conclude that the petitioners have failed to carry the burden of proof placed upon them by Rule 142(a). Accordingly, we find that the allocable portion of the Mt. Riley Ranch purchase price with respect to the 56.75 miles of fencing is $48,375.

## C. Forage

The next allocation issue concerns the forage on the patented land and on the Federal and State grazing acreage at the time petitioners purchased the ranch. Petitioners contend that due to the superior condition of the existing forage on such premises, an additional premium of 50 cents per acre was both warranted and paid by them when they purchased the Mt. Riley Ranch. Therefore, they contend that they could collectively expense $40,000 of the $313,000 purchase price as "feed purchased" for taxable year 1975. Respondent contends that any existing renewable forage on such premises is simply a part of the Federal and State grazing privileges and petitioners' real property interest in their patented land.

Allocation of part of the purchase price of land to existing crops thereon has been permitted by this Court. *Watson v. Commissioner*, 15 T.C. 800, 815–816 (1950), affd. 197 F.2d 56 (9th Cir. 1952), affd. 345 U.S. 544 (1953). There, the allocation was necessary to properly apportion sales proceeds between land and unharvested crops to determine the amounts of capital gains and ordinary income, respectively.[11] In the immediate case, however, the petitioners have sought to allocate a portion of the purchase price of a ranch to its existing forage for which they subsequently claimed deductions as "feed purchased."

Deductions are generally permissible for the expenses of a trade or business or for the production of income only if they

---

[11] We note that, with the adoption of sec. 1231(b)(4), this allocation is no longer necessary in all instances.

are "ordinary and necessary." Secs. 162 and 212, respectively. The burden of clearly showing the right to the claimed deduction is on the taxpayer. *Interstate Transit Lines v. Commissioner*, 319 U.S. 590 (1943); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435 (1934).

In the instant case, petitioners have failed to satisfy their burden of proving that $40,000 of the Mt. Riley Ranch purchase price was properly allocable to its existing forage and that such amount was an ordinary and necessary expense of their ranching operations. There is no evidence that petitioners used the forage on the Mt. Riley Ranch for grazing purposes with respect to animals in which they actually had an interest. Rather, petitioners leased back the ranch and existing forage thereon to the Strausses, the prior owners, on the day they purchased it. Further, no additional charge for the allegedly superior-quality forage was paid for by the Strausses. In fact, the Strausses leased a total of 82,060 acres from petitioners for a period of 1 year and also acquired an alleged $40,000 of forage for a mere $17,914. Assuming that petitioners' payment of such expenses was necessary, the record is devoid of evidence indicating that similar transactions of this type are common or frequent in the ranching industry. *Deputy v. du Pont*, 308 U.S. 488 (1940). Furthermore, petitioners' only evidence concerning the value of such forage was the self-serving testimony of Kermit Uecker, who admitted he was not a rancher, that it was "worth an extra 50 cents an acre." Therefore, we conclude that petitioners have failed to carry their burden of proving that $40,000 of the Mt. Riley Ranch purchase price was allocable to its existing forage and that such amount was an ordinary and necessary expense of their ranching operations. Accordingly, no allocation with respect to the forage is warranted and respondent's disallowance of the $40,000 "feed purchased" expense is sustained.

## D. Federal Grazing Privileges

The final allocation concerns that portion of the Mt. Riley Ranch purchase price attributable to the Federal grazing privileges on 75,360 acres of land owned by the United States and administered by BLM. The parties have agreed that once the preceding allocations have been made, the remaining

balance of the purchase price, i.e., $188,920, is attributable to such Federal grazing privileges.

## II. USEFUL LIVES

The parties are in agreement concerning the useful lives of the ranch's physical improvements over which depreciation deductions may be claimed. They also agree that the patented land is nondepreciable. The parties, however, do not agree on the useful lives of the Federal and State grazing privileges. Petitioners note the absence of specific renewal options in their grazing agreements with BLM and the State of New Mexico. Therefore, they contend that pursuant to sections 162(a)(3) and 178 and section 1.162–11(a), Income Tax Regs., the allocable portions of the ranch purchase price with respect to the Federal and State grazing privileges must be amortized and deducted over the specific terms of such grazing agreements, i.e., 1 and 5 years, respectively. Respondent contends that such grazing privileges have indeterminate lives due to preferential application and renewal privileges; hence, deductions amortizing their respective costs are not permitted.

### A. Federal Grazing Privileges

Upon petitioners' purchase of the Mt. Riley Ranch, they acquired grazing privileges with respect to 75,360 acres of lands which are administered by BLM through annual licensing procedures. In *Shufflebarger v. Commissioner*, 24 T.C. 980 (1955), we determined that Federal grazing privileges with respect to public lands are an intangible asset. Section 167 allows as a deduction a reasonable allowance for the exhaustion of property used in a taxpayer's trade or business. Section 1.167(a)-3, Income Tax Regs., provides that:

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. * * * An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. * * *

After considering all of the evidence presented on this issue, we conclude that petitioners have failed to carry their burden of proving that the Federal grazing privileges are intangible assets useful "for only a limited period, the length of which

can be estimated with reasonable accuracy." Pursuant to the Taylor Grazing Act, attendant regulations, and established Department of Interior policies, by virtue of petitioners' ownership of the patented land at the Mt. Riley Ranch, they are entitled to preferential renewal privileges concerning BLM's licensing of future Federal grazing privileges with respect to the 75,360 acres of lands in BLM's Las Cruces grazing district. Further, the BLM's Las Cruces district area manager testified that the owners of the patented land at the Mt. Riley Ranch have had preferential application and renewal rights concerning Federal grazing privileges since 1935. Although the AUM limits accompanying such Federal grazing lands may be altered due to varying range conditions, any adjustments in the Mt. Riley Ranch AUM levels would be made on a proportional basis with other similarly licensed individuals.[12] Thus, despite the annual licensing procedures utilized by BLM to administer such public lands, it appears unlikely that petitioners would ever suffer an involuntary and complete cancellation of their grazing privileges.

This Court has previously examined the useful lives of grazing privileges arising under section 3 of the act.[13] Further, in *Shufflebarger v. Commissioner, supra,* we reviewed similar U.S. Department of Agriculture grazing privileges which also possessed preferential rights of renewal. In both cases, we held that the useful lives of the grazing privileges were not delimited by the term of the current grazing permit or license, but were of indefinite duration.

Petitioners' reliance upon section 178, which concerns the amortization and depreciation of *leasehold* costs and improvements, is misplaced. Petitioners' 1-year grazing *license* and preferential application and renewal privileges arising by virtue of their ownership of adjacent patented lands do not confer upon them "any right, title, interest, or estate in or to the lands." 43 U.S.C. sec. 315b (1964). Black's Law Dictionary 1036 (4th ed. 1968), defines the term "leasehold" as "An estate in realty held under a lease." Therefore, petitioners do not possess a leasehold interest as to the Federal grazing privileges

---

[12] 43 C.F.R. sec. 4111.4 (1974).

[13] *Central Arizona Ranching Co. v. Commissioner,* T.C. Memo. 1964-217.

within the purview of section 178 and even if they did, the result would be the same.[14] Finally, petitioners' contention that section 162(a)(3) and section 1.162–11(a), Income Tax Regs., permit them to deduct the cost of acquiring the Federal grazing privileges over the unexpired term of their 1-year grazing license must be rejected in that the Federal grazing privileges constitute an asset whose useful life exceeds 1 taxable year; hence, deductions amortizing its cost, if any, must be computed pursuant to depreciation provisions. *Shutler v. United States*, 470 F.2d 1143 (10th Cir. 1973), cert. denied 411 U.S. 982 (1973); *Howard v. Commissioner*, 39 T.C. 833 (1963).

Therefore, we conclude that petitioners have failed to carry their burden of proving under Rule 142(a) that such Federal grazing privileges have a useful life which can be estimated with reasonable accuracy. Accordingly, no deductions amortizing any portion of the costs of acquiring such grazing privileges are permissible. *Shutler v. United States, supra; Toledo TV Cable Co. v. Commissioner*, 55 T.C. 1107 (1971), affd. 483 F.2d 1398 (9th Cir. 1973); sec. 1.167(a)-3, Income Tax Regs.

## B. State Grazing Privileges

Upon petitioners' purchase of the Mt. Riley Ranch, they also acquired a 5-year lease, which commenced October 1, 1974, granting grazing privileges with respect to 6,540.76 acres of land owned by the State of New Mexico.

Section 178 governs the amortization and depreciation of leasehold costs and improvements, and relevant portions thereof are set forth in the margin.[15] Subsections (a) and (c)

---

[14]See our analysis of sec. 178 in the following pages.

[15]Sec. 178 provides as follows:

SEC. 178. DEPRECIATION OR AMORTIZATION OF IMPROVEMENTS MADE BY LESSEE ON LESSOR'S PROPERTY.

(a) GENERAL RULE.—Except as provided in subsection (b), in determining the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization—

(1) in respect of any building erected (or other improvement made) on the leased property, if the portion of the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) remaining upon the completion of such building or other improvement is less than 60 percent of the useful life of such building or other improvement, or

(2) in respect of any cost of acquiring the lease, if less than 75 percent of such cost is attributable to the portion of the term of the lease (excluding any period for which the

incorporate "more probable" and "reasonable certainty" tests, respectively, for determining the depreciation term of leasehold costs and improvements. Although petitioners' State grazing lease does not specifically include a renewal option, pursuant to New Mexico law, petitioners, as prior lessees of the State grazing lands, have preferred renewal rights to the leased lands which would always give them at least the opportunity to continue the grazing lease.[16] Section 178–1(b)(1), Income Tax Regs., states that the renewal option need not be specifically provided for in the lease. Therefore, such preferred renewal rights constitute a renewal option for the purposes of section 178. Applying even the more stringent test of section 178(c) to the evidence presented, we conclude that the facts show with reasonable certainty that the State grazing privileges would be renewed, extended, or continued for an indefinite term upon petitioners' purchase of the Mt. Riley Ranch.

Due to the relatively small size of petitioners' patented land at the Mt. Riley Ranch, the Federal and State grazing privileges are an essential component of any successful ranching operation. Yet the Federal and State lands are intermingled with no physical barriers separating them. Therefore, in order to prevent the loss of livestock and to avoid actionable trespass on the lands of another when grazing one's

---

lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee) remaining on the date of its acquisition,

the term of the lease shall be treated as including any period for which the lease may be renewed, extended, or continued pursuant to an option exercisable by the lessee, unless the lessee establishes that (as of the close of the taxable year) it is more probable that the lease will not be renewed, extended, or continued for such period than that the lease will be so renewed, extended, or continued.

\*       \*       \*       \*       \*       \*       \*

(c) REASONABLE CERTAINTY TEST.—In any case in which neither subsection (a) nor subsection (b) applies, the determination as to the amount allowable to a lessee as a deduction for any taxable year for exhaustion, wear and tear, obsolescence, or amortization—

(1) in respect of any building erected (or other improvement made) on the leased property, or

(2) in respect of any cost of acquiring the lease,

shall be made with reference to the term of the lease (excluding any period for which the lease may subsequently be renewed, extended, or continued pursuant to an option exercisable by the lessee), unless the lease has been renewed, extended, or continued or the facts show with reasonable certainty that the lease will be renewed, extended, or continued.

[16] N.M. Stat. Ann. sec. 7–8–51 (1953).

herds, it follows that any user of the Mt. Riley Ranch patented land would necessarily utilize both the Federal and State grazing acreages.

In *Shutler v. United States*, 470 F.2d 1143 (10th Cir. 1973), cert. denied 411 U.S. 982 (1973), the court considered the issue of whether a reasonable certainty of renewal existed with respect to a 5-year State of Oklahoma agricultural lease which was subject to various renewal preferences. There, the court reversed the trial court's finding and held that, although the lease itself did not contain a renewal option, Land Office of the State of Oklahoma regulations and policy creating preferential renewal privileges for prior lessees established a reasonable certainty of renewal. Further, the court held that pursuant to section 1.167(a)-3, Income Tax Regs., no amortization of the cost of the grazing privileges was proper because their useful lives could not be computed with reasonable accuracy.

The renewal preferences accompanying the Oklahoma agricultural lease in *Shutler* and petitioners' New Mexico grazing lease are extremely similar. Therefore, we adopt the court's analysis of the renewal preferences in *Shutler* and hold that the facts show with reasonable certainty that petitioners' State grazing privileges would be renewed, extended, or continued for an indefinite term when they purchased the Mt. Riley Ranch; hence, no deductions amortizing any part of the cost of such State grazing privileges are permissible under section 178. Further, given the indefinite term of petitioners' State grazing privileges, we hold that petitioners have also failed in their burden of proof to establish the useful life of this asset with reasonable accuracy. Rule 142(a); sec. 1.167(a)-3, Income Tax Regs.

Petitioners' alternate claim that the acquisition costs of the State grazing privileges can be deducted pursuant to section 162(a)(3) over the remaining unexpired term of the grazing lease must also be rejected. The State grazing privileges constitute an intangible asset whose useful life is not delimited by its stated term. *Shufflebarger v. Commissioner*, 24 T.C. 980 (1955). Therefore, any deductions amortizing its cost are permissible only if petitioners can establish its useful life with reasonable accuracy and we have held that they failed to carry

their burden of proof. Rule 142(a); sec. 1.167(a)-3, Income Tax Regs.

Accordingly, we conclude that upon the evidence presented, the facts show with reasonable certainty that at the time of petitioners' purchase of the Mt. Riley Ranch, the State grazing lease would be renewed, extended, or continued for an indefinite term, which thus precludes deductions amortizing the cost of acquiring the leasehold under section 178. Further, due to petitioners' failure to carry their burden of proof that this asset has a useful life which can be established with reasonable accuracy, no deductions amortizing any part of the cost of this asset are permissible. *Shutler v. United States, supra; Toledo TV Cable Co. v. Commissioner, supra;* sec. 1.167(a)-3, Income Tax Regs.

## III. INVESTMENT CREDIT

The remaining issue for decision concerns whether any of the ranch components qualify for investment credit pursuant to section 38. The Commissioner denied petitioners' claimed credit on the basis that the property did not qualify. Petitioners presented no evidence on this issue, and the record is unclear as to the assets for which petitioners claimed investment credit. Petitioners' only reference to this issue in their briefs is their statement that they "are entitled to investment credit which flows from the Court's allocation of costs to the assets acquired." Petitioners have clearly failed to carry their burden of proving their entitlement to such investment credit. Rule 142(a). Accordingly, subject to the preceding allocations of the Mt. Riley Ranch purchase price, the Commissioner's disallowance of the claimed investment credit is approved.

Finally, we must deny petitioners' request for reasonable attorney fees because we cannot lawfully award such in the immediate proceeding.[17]

*Decisions will be entered under Rule 155.*

---

[17]Although this Court can award attorney fees pursuant to sec. 7430 in actions commenced after Feb. 28, 1983, it has no similar authority with respect to proceedings begun prior to such date. *McQuiston v. Commissioner,* 78 T.C. 807 (1982), affd. without published opinion 711 F.2d 1064 (9th Cir. 1983).